**William GROSECLOSE, et al. ex rel. Ronald HARRIES, Petitioners,**

**v.**

**Michael DUTTON, Warden, et al.**

**Ronald HARRIES, Plaintiff,**

**v.**

**Michael DUTTON, Warden, et al.**

**No. 3–84–0579.**

United States District Court,
M.D. Tennessee,
Nashville Division.

Aug. 17, 1984.

Larry D. Woods, Jinx Woods, William Marett, Woods, Bryan Woods & Watson, Nashville, Tenn., for William Groseclose et al.

Richard McGee and William Redick, Nashville, Tenn., for Ronald Harries.

Hal D. Hardin, Nashville, Tenn., for Harries as guardian ad litem.

William Leech, Atty. Gen., Wayne E. Uhl and Robert Grunow, Asst. State Attys. Gen., Nashville, Tenn., for Michael Dutton et al.

## MEMORANDUM AND ORDER

JOHN T. NIXON, District Judge.

Pursuant to the Court's Memorandum and Order issued on June 8, 1984, *Groseclose ex rel. Ronald Harries v. Michael Dutton, et al.*, 589 F.Supp. 362, (M.D.Tenn. 1984), an evidentiary hearing was held on July 12 and 13, 1984 to determine whether this Court has jurisdiction to entertain the

petitioners' third-party next friend habeas corpus petition submitted under 28 U.S.C. § 2242. The petitioners on June 6, 1984 sought habeas corpus relief for Ronald Harries due to his decision to waive post-conviction remedies in state and federal courts challenging his conviction of murder and sentence of death by electrocution, 657 S.W.2d 414, then scheduled for June 13, 1984 by Order of the Supreme Court of the State of Tennessee. The respondents sought dismissal of the third-party habeas petition arguing that the petitioners lacked standing to act on behalf of Mr. Harries. Because of the petitioners' allegations and documentary evidence showing that the respondents' administration of drugs to Mr. Harries hampered his ability to appreciate the gravity of his decision to waive judicial relief, this Court concluded that an evidentiary hearing was necessary on the standing of petitioners to invoke this Court's jurisdiction.[1] Accordingly, the Court stayed the execution of Ronald Harries.

Since this Court's decision to stay indefinitely the execution of Mr. Harries pending an evidentiary hearing, all parties have engaged in reasonable, unlimited and expedited discovery. 4 J. Moore, *Federal Practice and Procedure* 26–190 (1983) (district court commits reversible error if it denies plaintiff an opportunity for discovery on jurisdiction in a complicated case). In addition, the passage of time has brought about a clarification of Mr. Harries' position in this case. Although he originally opposed and sought dismissal of the third-party habeas petition, Mr. Harries now contends that while he intelligently decided to waive further judicial review, his decision was not voluntary because of the unconstitutional conditions of confinement to which he is being subjected while in the respondents' custody. By Order issued July 6, 1984, this Court permitted Ronald Harries to proceed in this case as a party plaintiff asserting the issue of his lack of voluntariness in waiving post-conviction remedies due to allegedly inhumane prison conditions.[2] The respondents timely moved the Court to reconsider that ruling. That motion and the respondents' motion to strike the sworn statement of Mr. Harries are DENIED for the reasons set forth in this Memorandum.

On July 12 and 13, 1984, the Court heard evidence from all parties on the issue of Mr. Harries' competency, including the lack of voluntariness in his decision to waive further judicial relief. While the evidentiary hearing on July 12 and 13, 1984 was in no way a full evidentiary presentation of the conditions existing on death row at the Tennessee State Penitentiary in Nashville, this Court permitted evidence on conditions to be admitted for the purpose of considering the issue presented by Mr. Harries. That issue and the competency question are the basis of the petitioners' argument that they have standing and that this Court has jurisdiction over the next friends' habeas petition.

■ In determining the standing of the petitioners to seek habeas relief for Mr. Harries, this Court applies the standard enunciated by the Fifth Circuit in *Weber v. Garza*, 570 F.2d 511 (5th Cir.1978), and the Sixth Circuit in *Johnson v. Avery*, 382 F.2d 353 (6th Cir.1967), *rev'd on other grounds*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). Those cases establish three requirements that a third-party must satisfy to acquire next friend habeas status under 28 U.S.C. § 2242. First, the third-party

---

1. The Order of June 8, 1984 also directed the respondents to cease administration of drugs to Mr. Harries so that his ability to reason would not be impaired. Consequently, the evidentiary hearing of July 12 and 13 did not address whether drugs impaired Mr. Harries' ability to waive available post-conviction remedies.

2. The relief sought by Mr. Harries and the petitioners distinguishes their interests in this case. In his 42 U.S.C. § 1983 complaint, Mr. Harries challenges the conditions of confinement on death-row and seeks injunctive relief correcting those conditions so that he might consider freely his legal alternatives challenging his conviction. Harries Complaint ¶ IV, No. 5. The petitioners not only question the constitutionality of death-row conditions and how those conditions effect Harries' waiver decision, but also attack the legality of his conviction and sentence of death under 28 U.S.C. § 2254. Petition. ¶¶ 8 and 21, No. 5.

applicant must show why the detained person did not sign and verify the petition and the relationship of the third-party applicant to the detained person. Second, the third-party applicant must not be using the next friend vehicle to engage in the unauthorized practice of law. Third, the third-party applicant under 28 U.S.C. § 2242 must "set forth an adequate reason or explanation of the necessity for resort to the 'next friend' device," otherwise the Court lacks jurisdiction to review the petition. *Weber*, 570 F.2d at 513–14. *Accord Johnson*, 382 F.2d at 357 (next friend petition appropriate when inmate suffers from physical or mental handicaps). There is no question that the petitioners are not using the next friend device to engage in the unauthorized practice of law. Thus, the inquiry in this case is whether there is an adequate explanation for Harries' failure to join in the habeas corpus petition.

■ The burden of establishing that this Court has jurisdiction is on the petitioners. *Weller v. Cromwell Oil Co.*, 504 F.2d 927, 929 (6th Cir.1974). Given that an evidentiary hearing has been held on the jurisdictional issue, the petitioners must show that jurisdiction exists by a preponderance of the evidence. *Welsh v. Gibbs*, 631 F.2d 436, 439 (6th Cir.1980), *cert. denied*, 450 U.S. 981, 101 S.Ct. 1517, 67 L.Ed.2d 816 (1981). *Accord Armbruster v. Quinn*, 711 F.2d 1332, 1335 (6th Cir.1983); *Data Disc, Inc. v. Systems Technology Associates, Inc.*, 557 F.2d 1280, 1285 (9th Cir.1977). The petitioners assert two separate theories on the jurisdictional/standing issue. They maintain initially that a third-party habeas corpus petition on behalf of Mr. Harries is warranted because Mr. Harries is mentally incompetent to make the decision to waive post-conviction remedies, which would result in his execution. Additionally, the petitioners join in Mr. Harries' argument that his decision to waive post-conviction remedies was involuntary because of adverse, if not unconstitutional, conditions of confinement. Thus, the petitioners seek to establish jurisdiction, by a preponderance of the evidence, over the next friend petition because Ronald Harries suffers from a mental disease and because the conditions of his confinement make his waiver of post-conviction remedies involuntary.

■ Before addressing the merits of these two arguments, this Court recognizes the gravity of the decision presented to Ronald Harries. Because he has not utilized available state and federal post-conviction remedies that would, if triggered, have the concommitant effect of staying his execution for six to ten years, he is allowing the State of Tennessee to execute him without his sentence of death receiving complete state and federal judicial review. Although there is no federal requirement that state criminal convictions undergo post-conviction judicial scrutiny, the right to seek post-conviction relief is one of the greatest constitutional privileges guaranteed to the American citizenry. *Preiser v. Rodriguez*, 411 U.S. 475, 485, 93 S.Ct. 1827, 1833, 36 L.Ed.2d 439 (1973). As has been repeatedly emphasized by the Supreme Court, habeas corpus actions are important in the constitutional scheme because they directly protect due process rights, which are highly valued. *Bounds v. Smith*, 430 U.S. 817, 827, 97 S.Ct. 1491, 1497, 52 L.Ed.2d 72 (1977) (relying on *Johnson v. Avery*, 393 U.S. 483, 485, 89 S.Ct. 747, 748, 21 L.Ed.2d 718 (1969) and *Wolff v. McDonnell*, 418 U.S. 539, 579, 94 S.Ct. 2963, 2986, 41 L.Ed.2d 935 (1974)). The due process protections embodied within the habeas corpus vehicle envision that "in a civilized society, government must always be accountable to the judiciary for a man's imprisonment: if the imprisonment cannot be shown to conform with the fundamental requirements of law … [then the imprisoned man is entitled to relief]." *Fay v. Noia*, 372 U.S. 391, 402, 83 S.Ct. 822, 829, 9 L.Ed.2d 837 (1963). If Mr. Harries incompetently or involuntarily decided to waive state and federal post-conviction remedies, then it would be a violation of due process for the respondents to execute him. If, on the other hand, Mr. Harries' decision to waive post-conviction remedies was made competently and voluntarily, then it be-

hooves society to accept that decision. As explained by Justice Rehnquist in his in chambers opinion in the case of *Lenhard v. Wolff,* 443 U.S. 1306, 100 S.Ct. 3, 61 L.Ed.2d 885 (1979):

> The idea that the deliberate decision of one under sentence of death to abandon possible additional legal avenues of attack on that sentence cannot be a rational decision, regardless of its motive, suggests that the preservation of one's own life at whatever cost is the *summon bonum,* a proposition with respect to which the greatest philosophers and theologians have not agreed and with respect to which the United States Constitution by its terms does not speak.

*Id.* at 1312–13, 100 S.Ct. at 7. Thus, while Mr. Harries' waiver decision directly affects whether he will live or die, the very nature of that decision does not preclude it from being one that may favor death over life.

■ Any decision to waive federally guaranteed rights requires that the court be convinced that the waiver decision is made intelligently and intentionally. *Johnson v. Zerbst,* 304 U.S. 458, 467–68, 58 S.Ct. 1019, 1024, 82 L.Ed. 1461 (1938). No less is required when the consequences of the waiver decision may result in the execution of the criminal defendant. Given that waivers of constitutional rights are not favored, this Court must be cautious in finding that a criminal defendant has waived constitutionally guaranteed rights. Indeed, this Court is obligated to indulge in every reasonable presumption against waiver of fundamental rights such as due process protections. *Johnson,* 304 U.S. at 464, 58 S.Ct. at 1023. *See also Glasser v. United States,* 315 U.S. 60, 70–71, 62 S.Ct. 457, 464–465, 86 L.Ed. 680 (1942). Even though not favored, however, a valid waiver may be accomplished if the evidence shows that the criminal defendant understood the nature of the constitutional rights waived and knowingly assented to

their waiver. *Phillips v. Neil,* 452 F.2d 337, 349 (6th Cir.1971), *cert. denied,* 409 U.S. 884, 93 S.Ct. 96, 34 L.Ed.2d 141 (1972).

## I.

In determining whether Mr. Harries competently waived his post-conviction remedies, this Court must make a sensitive inquiry into whether he appreciates the legal alternatives available to him or whether he is suffering from some mental disease. As articulated by the Supreme Court in *Rees v. Peyton,* 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966), this Court must determine whether Mr. Harries has the

> capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand, whether he is suffering from a mental disease, disorder or defect which may substantially affect his capacity in the premises.

*Id.* at 314, 86 S.Ct. at 1506. The parties agree that the *Rees* standard properly applies in this case to determine the competency of Mr. Harries.

■ The burden of proving, by a preponderance of the evidence, that Mr. Harries is incompetent is on the petitioners seeking to act on his behalf. *Evans v. Bennett,* 440 U.S. 1301, 1304, 99 S.Ct. 1481, 1483, 59 L.Ed.2d 756 (1979); *Gilmore v. Utah,* 429 U.S. 1012, 1014, 97 S.Ct. 436, 437, 50 L.Ed.2d 632 (1976); *Lenhard v. Wolff,* 603 F.2d 91, 93 (9th Cir.), *aff'd,* 444 U.S. 807, 100 S.Ct. 29, 62 L.Ed.2d 20 (1979); *Weber v. Garza,* 570 F.2d 511, 513–14 (5th Cir.1978).[3] Under the *Rees* standard, the petitioners must present the medical opinion of qualified experts based upon "sufficient opportunity for proper psychiatric and psychological evaluation." *Hays v. Murphy,* 663 F.2d 1004, 1011 (10th Cir.1981). In assessing the medical opinions presented, the brevity of the medical evaluations, the substance of the questions asked Mr.

---

**3.** This Court recognizes that it initially ruled that the burden of proving the competency of Mr. Harries was on the respondents. Having determined that the burden of proof was erro-

neously placed on the respondents, this Court has corrected that error by evaluating the evidence under the proper standard.

Harries, the atmosphere in which the evaluations took place and whether any psychological tests were given by the experts are but an example of some of the relevant factors to be considered by the Court. *Hays*, 663 F.2d at 1012–13 and n. 12.

■ In this case, the Court was presented with five medical experts who evaluated and made conclusions on whether Ronald Harries was competent. Doctors Otto Billig, Harold Jordan and Dorothy Lewis testified that Mr. Harries was not competent to make the decision to waive post-conviction remedies. Doctors Robert Begtrup and William Kenner concluded that Mr. Harries is competent to make decisions for himself, including that of waiving further judicial review of his conviction and sentence.

The cornerstone of the petitioners' proof that Mr. Harries is incompetent was the testimony of Dr. Dorothy Lewis, a Professor of Psychiatry at New York University, Bellevue Medical Center and a clinical Professor of Psychiatry at Yale University Child Study Center. She is board certified in psychiatry and significantly published in that field. Moreover, Dr. Lewis has performed competency evaluations on death-row inmates in other states. After a six-hour evaluation of Ronald Harries on Wednesday, July 11, 1984, Dr. Lewis concluded that Mr. Harries suffers from bipolar mood disorder, which is commonly known as manic depressive illness. It is a psychotic disturbance characterized by mood changes from extreme euphoria to extreme depression, which may last from a day to weeks or months at a time. When experiencing one of the extreme mood periods, the patient is out of touch with reality, but in between the extreme mood periods, the patient is intact and capable of coping with reality. Dr. Lewis further concluded that when Ronald Harries decided to waive his post-conviction remedies, he had no understanding that he might be executed. Thus, his decision was not based on reality. This viewpoint was confirmed by Mr. Harries when he testified and publicly expressed his thanks to petitioners' counsel for saving his life. According to Dr. Lew-

is, Ronald Harries entered a depressive stage about eighteen months ago when certain prison activities were curtailed. Harries became extremely depressed, withdrew to his cell, stayed in bed all day and lost about thirty pounds. During the onslaught of this depression a feeling of hopelessness overcame him. Previously, Mr. Harries experienced a manic phase, during which he was extraordinarily high as characterized by his writing fifteen letters per night of about fifteen pages each in length. He was also very talkative. The depressive stage has been going on for the past eighteen months, and while he may have short periods of being in touch with reality, Dr. Lewis carefully explained that Harries is not competent because he cannot sustain a mood long enough to be certain that decisions rendered today will be in accordance with his wishes tomorrow. Moreover, this psychotic disorder does not prevent Mr. Harries from presenting an impressive front showing intelligence, coherence and articulation, but this breaks down the more one talks to him.

The second major conclusion of Dr. Lewis was that Ronald Harries suffers from some central nervous system impairment, which may be a precipitant to the bipolar mood disorder. Dr. Lewis made this finding based on several mental and psychological tests she performed on Harries during her evaluation and because his medical history, which shows some indication of seizures. While Dr. Lewis did not find that the central nervous system impairment in and of itself was important in Harries' decision to waive post-conviction remedies, she concluded that in combination with Harries' bipolar mood disorder, the central nervous system problem had an adverse effect on Mr. Harries' ability to reason.

The Court was further impressed by the overall confirmation of Dr. Lewis' conclusion with past incidents involving Harries. For example, Dr. Lewis found that when Harries was given the drug Sinequan, a manic phase was precipitated and he became very violent and angry. This reaction explains, at least in part, Harries' guard

hostage episode because the evidence shows he had received Sinequan before that incident. Another confirmation of Dr. Lewis' conclusion of bipolar mood disorder is the history of first degree relatives of Harries with an apparent bipolar disorder. Conversation with Harries indicates abnormal behavior by his father and grandfather. Thus, Dr. Lewis believes that Harries' bipolar mood disorder has some hereditary origins.

The Court finds Dr. Lewis' diagnosis credible and based upon sufficient opportunity for proper psychiatric and psychological evaluation. Dr. Lewis' evaluation lasted longer than any other expert, and she covered more substantive areas of Mr. Harries' mental health than any other expert. She was the only medical expert to use psychological testing of Mr. Harries in reaching her conclusions on Harries' competency. Moreover, Dr. Lewis' conclusions were based on more background information concerning Harries than any other expert. In the judgment of this Court, Dr. Lewis' conclusion that Harries is incompetent to make the decision to waive his post-conviction remedies is more credible and has a more convincing force than the testimony of either of respondents' experts. Both Doctors Kenner and Begtrup, respondents' experts, disagreed with Dr. Lewis' conclusion.

Dr. William Kenner is engaged in the private practice of adult and child psychiatry and is an assistant clinical Professor of Psychiatry at Vanderbilt University School of Medicine. Dr. Kenner is not board certified, but he does have experience evaluating the competency of criminal defendants to stand trial. Dr. Kenner's opinion that Harries is competent is based upon his review of Harries' prison medical file and five meetings with Harries over a five-day period. Dr. Kenner's meetings with Harries ranged from thirty minutes to an hour and fifteen minutes in duration. Based on his evaluation of Harries and his medical file, Dr. Kenner concluded that Ronald Harries was competent to make the decision to waive post-conviction remedies. While finding that sensory deprivation may affect Mr. Harries, Dr. Kenner did not believe that it affected Harries' competency to make a waiver decision. Dr. Kenner specifically disagreed with Dr. Lewis' diagnosis of manic depressive illness and found Mr. Harries to have no abnormal or over-inflated estimation of himself.

The conclusion of Dr. Robert O. Begtrup, an assistant clinical Professor of Child Psychiatry at Vanderbilt University School of Medicine and Clinical Director of the Harriet Cohn Mental Health Center in Clarksville, Tennessee, on Mr. Harries' competency was based upon two visits with him for two hours per visit, which occurred in June and July 1984. Dr. Begtrup is board certified in psychiatry and has experience in evaluating the competency of criminal defendants. Based on conversations with Harries during two meetings and background information on Harries in the respondents' possession, Dr. Begtrup concluded that Mr. Harries is competent to make the decision to waive post-conviction remedies. He found that Harries understood the consequences of his waiver decision, understood the legal options available to him and understood the role of his attorneys, the Government and the courts in his decision. According to Dr. Begtrup, Harries has a wide range of moods, which is normal. Dr. Begtrup admitted, however, that his conclusions were based on less information than that used by Dr. Lewis and that he could not rule out the possibility that Mr. Harries suffered from a manic depressive illness.

The problem of sensory deprivation identified by Doctors Kenner and Begtrup as affecting Mr. Harries but not his waiver decision was also found by Dr. Otto Billig, who is a leading psychiatrist, having taught at the Vanderbilt University School of Medicine for over twenty-five years. Dr. Billig is board certified in psychiatry and author of numerous psychiatric articles. He met with Harries on two occasions from one and one-half to two hours at the prison. Dr. Billig testified that in his opinion Mr. Harries was incompetent to make the decision to waive post-conviction

remedies. Not only did Dr. Billig find Harries' mood to be euphoric before the stay of execution, he also concluded that Harries suffered from sensory deprivation due to the conditions of his confinement, which altered his level of consciousness. As a result of the sensory deprivation, Mr. Harries suffers from derealization—that is things become unreal to him or matters lose their usual meaning. This finding was supported convincingly by literature in the field. Moreover, Dr. Billig's findings were consistent with those of Dr. Lewis, especially in terms of Harries' altered perception of reality.

Like Dr. Billig, Dr. Harold Jordan, a board certified psychiatrist and currently Professor and Chairman of the Department of Psychiatry at Meharry Medical College, found after his evaluation of Mr. Harries that he suffers from sensory deprivation. Dr. Jordan viewed the cell and living conditions of Mr. Harries and concluded that those conditions were deplorable. Dr. Jordan found the following: limited, if not cramped, living space within the cell, poor ventilation resulting in extremely warm temperatures, no direct sunlight, little direct access to other people and limited opportunities for proper exercise. Because of these adverse conditions to which Mr. Harries has been subjected for several years, Dr. Jordan believed that Mr. Harries' waiver decision indicated a suicidal intent that renders him incompetent. Although Dr. Jordan was of the opinion that Mr. Harries was generally intelligent, he, nevertheless, opined that for the purpose of deciding whether to waive post-conviction remedies, Ronald Harries was incompetent. This finding was reinforced in Dr. Jordan's judgment after Harries went through the death watch procedure. Having been placed in the death watch cell from which he could view the electric chair continuously, Harries became very anxious and unable to reconsider the gravity of his decision and consequently persisted in his desire to be executed. This was clearly incompetent and suicidal behavior on the part of Mr. Harries, according to Dr. Jordan.

Having considered the opinion of all the medical experts, this Court finds that the petitioners have proven by a preponderance of the evidence that Mr. Harries has a serious mental disease, disorder or defect existing prior to the initiation of this case and during critical earlier times so as to render his waiver of post-conviction remedies void. This Court finds the testimony of Doctors Lewis, Billig and Jordan to be credible and more convincing on the issue of competency than the opinions of Doctors Kenner and Begtrup. In particular, the Court is impressed with the depth of Dr. Lewis' analysis of Mr. Harries' mental condition. While the conclusions of Doctors Kenner and Begtrup differed from those of Doctors Billig and Jordan, this Court finds the inquiry of Dr. Billig and Dr. Jordan on the matter of sensory deprivation affecting Harries' judgment to be more persuasive.

## II.

Turning to the petitioners' second theory to support their next friend petition, this Court's research and that of all parties indicate that the issue of the voluntariness of an inmate's decision to waive post-conviction remedies, when an inmate faces a sentence of death, has never been addressed by any other court. The petitioners and Mr. Harries argue that his decision to waive post-conviction remedies was involuntary because of the adverse conditions of confinement. As Mr. Harries testified, he decided not to pursue any challenge to his conviction and sentence because it would mean that he would have to live on death-row for six to ten years under deplorable conditions. Such a waiver is not, however, inherently unreasonable as long as it is made freely. Yet if not freely made, then, as previously pointed out, it is a violation of due process for a criminal defendant to bypass the safeguards created in federal and state post-conviction procedures.

By analogy to the area of criminal guilty pleas, this Court believes that a decision to forego due process protections created for a criminal defendant demands a voluntary

relinquishment of constitutional rights. When a criminal defendant desires to enter a guilty plea to pending criminal charges, the court must determine whether the defendant is competent[4] to enter such a plea. *United States v. Masthers*, 539 F.2d 721, 725 (D.C.Cir.1976). Because a guilty plea constitutes a conclusive conviction to which the trial court need only render judgment and sentence, a criminal defendant who desires to plead guilty must understand that he is waiving his constitutional right to trial by jury, to confront his accusers and to avoid compulsory self-incrimination. *See, e.g., Boykin v. Alabama*, 395 U.S. 238, 243, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274 (1969); *McCarthy v. United States*, 394 U.S. 459, 466, 89 S.Ct. 1166, 1170, 22 L.Ed.2d 418 (1969). Before a waiver of constitutional rights is accepted in a guilty plea, the court must be satisfied that the guilty plea is voluntary and not the result of any force, threat or inducement other than the genuine desire to confess guilt to the crime. FED.R.CRIM.P. 11(d) and (e); *United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir.1981) (a voluntary confession must be the product of a rational mind and the free will of a defendant). Absent sufficient voluntariness, a guilty plea violates due process and is therefore void. *United States v. Masthers*, 539 F.2d at 725. Given the necessity that a guilty plea be voluntary, waiver of post-conviction remedies that may result in execution of a criminal defendant *a fortiori* requires a competently and voluntarily made waiver.

■ To determine whether a criminal defendant's conduct is voluntary under the Federal Constitution, this Court must evaluate under the totality of the circumstances, *Haynes v. Washington*, 373 U.S. 503, 513–14, 83 S.Ct. 1336, 1342–43, 10 L.Ed.2d 513 (1963), whether the defendant's conduct is the product of a rational intellect and unconstrained will. *Townsend v. Sain*, 372 U.S. 293, 307, 83 S.Ct. 745, 754, 9 L.Ed.2d 770 (1963); *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961). Consequently, a defendant's conduct is not voluntary if it is the result of an overborn will or the product of an impaired self-determination brought on by the exertion of any improper influences, *Culombe*, 367 U.S. at 602, 81 S.Ct. at 1879; *Malloy v. Hogan*, 378 U.S. 1, 7, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964). Under any circumstances, voluntariness of the defendant's conduct must be proven by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972); *see also United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir.1981).

Application of the constitutional standard to determine voluntariness was applied in *Townsend v. Henderson*, 405 F.2d 324 (6th Cir.1968), in a situation involving an inmate's subjection to adverse conditions of confinement. After a prison altercation involving several prisoners, one inmate, named Terry, confessed to involvement in the incident after prison officials placed him naked in solitary confinement while suffering from a head wound. Terry was placed in a dark cell and given only bread and water to eat. The cell contained primitive sanitary conditions and a board for a bed. *Id.* at 327. The Sixth Circuit reached what it labeled the "inevitable conclusion"

---

4. In determining the competency of a criminal defendant to enter a guilty plea, courts apply the competency standard that originated in *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), which is equivalent to the *Rees* competency test. *See, e.g., Williams v. Bordenkircher*, 696 F.2d 464, 466–67 (6th Cir.), *cert. denied*, 461 U.S. 916, 103 S.Ct. 1898, 77 L.Ed.2d 287 (1983). In *Dusky*, the Court found that the district court's failure to consider enough evidence on the competency of the defendant to stand trial rendered its decision on the defendant's competence erroneous. In criticizing the district judge's limited findings on the defendant's perception of time and place orientations, the Supreme Court held that a criminal defendant is not competent to stand trial unless "he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as a factual understanding of the proceedings against him." *Id.* 362 U.S. at 402, 80 S.Ct. at 788. Like the *Rees* test, the standard set forth in *Dusky* highlights the constitutional necessity that a criminal defendant understand the proceedings and then be capable of aiding his legal counsel in choosing among legal alternatives.

that, under the circumstances, Terry's confession was involuntary because he lacked the "free choice to admit, to deny, or to refuse to answer." *Id.* at 328–29. The conditions of Terry's confinement rendered his confession, although knowingly made, inherently involuntary.

In the present case, Mr. Harries alleges that the conditions of his confinement render involuntary his decision to waive his right to post-conviction habeas relief and acceptance of his sentence of death. The respondents argue that "the mere fact that a prisoner has chosen execution over life on death row does not render the prisoner incompetent, even if the conditions are possibly unconstitutional." Respondents' Pre-Hearing Brief at 4. The respondents rely on *Evans v. Bennett*, 467 F.Supp. 1108, 1110 (S.D.Ala.1979), in which the district judge reasoned that John Evans' decision to waive post-conviction remedies was rational given the allegations of unconstitutional conditions existing on death-row in the Alabama State penitentiary. Justice Rehnquist approved the district judge's reasoning in his opinion as Circuit Justice in *Evans v. Bennett*, 440 U.S. 1301, 1305, 99 S.Ct. 1481, 1483, 59 L.Ed.2d 756 (1979). Nevertheless, *Evans* is clearly distinguishable from this case because Mr. Harries alleges that his decision to waive his post-conviction remedies was involuntary, however rational it may have been under the circumstances. Given the hesitancy of accepting waiver of rights, this Court does not find *Evans* dispositive of the matters raised by Mr. Harries. The lack of voluntariness alleged by Mr. Harries also differentiates his case from *Lenhard v. Wolff*, 444 U.S. 807, 811 n. 2, 100 S.Ct. 29, 30 n. 2, 62 L.Ed.2d 20 (1979) (Marshall, J., dissenting) in which Jesse Bishop argued that the conditions of his confinement made him incompetent. In this Court's judgment, the issue of whether the waiver of post-conviction remedies due to alleged unconstitutional conditions of confinement has never been addressed by the Supreme Court. Indeed, the issue asserted by Mr. Harries is one of first impression.

In regard to the conditions of confinement at issue in this case, the Court received evidence from the petitioners, the guardian ad litem and Mr. Harries. The evidence from the petitioners consisted of the direct testimony of their medical experts—Doctors Lewis and Jordan, who viewed Harries' cell, and the testimony elicited from Doctors Kenner and Begtrup, respondents' experts. The evidence from the guardian was presented in the form of the depositions of four inmates on death row—Timothy Eugene Morris, Richard Houston, Philip R. Workman and Richard W. Simon—and the deposition of Ernest Pellegrin, Commissioner of the Tennessee Department of Corrections. The guardian also presented discovery obtained from the respondents, probative of the issue of conditions of confinement. Mr. Harries' evidence consisted of his testimony and that of his Catholic Deacon Frank Bainbridge. The Court has considered this evidence, not in terms of whether it shows a violation of the Eighth Amendment to the United States Constitution, but, in light of the jurisdictional issue, whether the petitioners have proved by a preponderance of the evidence that Mr. Harries' failure to join in the next friend petition and seek post-conviction relief was the result of the coercive conditions of his confinement.[5] The re-

---

**5.** Although the court in *Grubbs v. Bradley*, 552 F.Supp. 1052 (M.D.Tenn.1982), found that the conditions of confinement that exist within twelve of Tennessee's adult penal institutions, including the Tennessee State Penitentiary wherein Unit VI is located, violated constitutional standards, that case does not preclude consideration of the conditions currently existing in Unit VI as raised by Mr. Harries. The *Grubbs* Court concluded that Unit VI's double celling of inmates and food service needed correction. *Grubbs*, 552 F.Supp. at 1125–26.

Moreover, having reviewed the documents recently submitted in *Grubbs* settling the remedial aspect of that case, this Court does not discern that conditions in Unit VI will be addressed as a result of the *Grubbs* case.

Consideration of *Grubbs*, however, supports Mr. Harries' claim of involuntary waiver of post-conviction remedies due to adverse conditions. That case stated that the "environmental conditions range from bad to shocking, and clearly have a deleterious impact upon the lives of the inmates housed there." *Grubbs*, 552

spondents offered no evidence to contradict the proof of adverse conditions in Unit VI. Thus, the Court's findings relative to Unit VI conditions are undisputed.

Although the Tennessee State Penitentiary was constructed between 1895 and 1898, Unit VI, which houses inmates confined pursuant to a sentence of death, was built in 1957. The Unit contains cells that are forty-four square feet in size and nine cells that are thirty-five square feet in size. Interrogatory No. 11. (hereinafter cited as "Int. No."). The cell occupied by Ronald Harries contains forty-four square feet of floor space. Admission No. 48 (hereinafter cited as "Adm. No."). Like the other forty-seven inmates in Unit VI, Mr. Harries is housed in a single cell. Adm. Nos. 48 and 107. Although some double-celling of Unit VI inmates existed prior to the decision in the class action case of *Grubbs v. Bradley*, 552 F.Supp. 1052 (M.D.Tenn.1982), Adm. No. 6, the respondents have corrected that practice as part of its efforts to comply with *Grubbs*. Adm. No. 11.

Mr. Harries lives in a six by eight foot cell, which contains a toilet with a wash basin in the toilet well. A bunk bed is provided for his use, which takes up about one-third of the cell. Lighting in the cell consists of one sixty-watt light bulb; additional lighting is available by use of an electrical hook-up, but this must be done at the inmate's expense. There is no window in Mr. Harries' cell and ventilation within his cell consists of blowers drawing out stale air. According to Mr. Harries, the ventilation is so poor that cigarette smoke stains his cell walls and toilet odors frequently make it difficult for him to sleep. Also, fumes from the respondents' use of oil-based paints result in difficulty in normal breathing.

Mr. Harries is confined in his cell for twenty-three hours per day. Respondents permit him to exercise during the day for forty to forty-five minutes and to shower daily for ten to fifteen minutes. At all other times, including the taking of his meals, Mr. Harries remains within his cell. The temperature in Mr. Harries' cell averages, according to the respondents, between eighty and eighty-five degrees Fahrenheit. Adm. No. 18. A stipulation jointly submitted by counsel for the respondents and Harries indicates that the temperature within his cell on July 11, 1984 was ninety degrees. Although the Court is wary of the circumstances upon which the stipulation is based, the stipulation indicates that the temperature within Mr. Harries' cell may reach uncomfortable and potentially life threatening limits.

Other death row inmates and the testimony of several medical experts who viewed Mr. Harries' cell substantiate the prison conditions described by Mr. Harries. According to inmate Simon, the lack of a window in his cell causes him to lose his orientation of time and direction. Moreover, Simon complains about the small width of his cell, which makes it difficult for him to maneuver. Similarly, Richard Houston, also a death-row inmate, asserts that the lack of proper lighting within the cell affects his eyesight. The ventilation problem is exacerbated when the humidity increases due to steam created from the showers of inmates. Houston Deposition at 8; Workman Deposition at 4.

The evidence before the Court also shows that respondents have notice of ventilation and sanitation problems that have existed on death-row for several years without any correction until recently. In a letter dated November 27, 1981 to then Warden Jim Rose from employees of respondents, the need for correction of certain ventilation problems as well as the offensive presence of an open sewer was discovered. The letter reads as follows:

> In the past months, both summer and winter, we have noted an extreme amount of humidity in the air in Unit 6. Often moisture in the air is so dense that, at room temperature, it condenses

F.Supp. at 1126. When the *Grubbs'* findings are considered with Mr. Harries' allegations of adverse conditions since the *Grubbs'* decision, this

Court rejects the respondents' argument that *Grubbs* forecloses Mr. Harries' claims.

on the walls and ceiling and runs in rivulets to the floor. Evidence of the continuing humidity can be seen in the patches of fungus found growing on the walls. Apparently this moisture is coming from the steam pipes in the room adjacent to the foyer and the dehumidifying effects of the air conditioning system are insufficient to cope with it. In the winter the air conditioning is off and there is no way for the moisture to escape at all.

During the periods of housekeeping when the ammonia based cleaner is used, the air in the unit is saturated to an intolerable level with the ammonia because of the inadequate venting in the unit of fresh air. Care should be exercised by housekeeping to use the very smallest amount of cleaning compound that is effective.

There is what appears to be an open sewer in the floor covered by a grate under the steam pipes in the room mentioned above. The odors from this grate are also becoming part of the air that is circulated in the system in the unit.

RECOMMENDATIONS:

1. Venting of steam room (actively) to outside.

2. Venting of fresh air (actively) to the inside unit.

3. Dehumidifying air of closed circulation system.

4. Sealing of open "sewer".

5. Restraint in the amount of cleaning compound and waxes used.

Petitioners' Exhibit No. 14. The authenticity of this letter was admitted by respondents. Further, when the letter is considered in conjunction with the uncontroverted testimony of Ronald Harries that all of the ventillation and sanitation problems identified, with the exception of the sewer problem, existed at the time of the evidentiary hearing, it is apparent to this Court that since 1981 the respondents have known about serious ventilation problems and health hazards in Unit VI and have either refused or unreasonably delayed correction of those problems.

The lack of exercise for Unit VI inmates makes the impact of prison conditions worse on death-row inmates. As a general practice, inmates are allowed forty-five minutes to exercise, but there is little for inmates to do. The exercise area is too small for running and the number of inmates in the yard restricts them from walking. Moreover, even when the inmates are outside to exercise, the grate that covers the exercise area restricts the sunlight from shining through. While the respondents have provided a set of weights for inmates, many are unable to use them. When the weather does not permit inmates to go into the small exercise area, during the winter or when it rains, no exercise is afforded to inmates. Thus, according to Mr. Harries and other death-row inmates, it is not unusual for inmates not to exercise for a week or more during such times. *See, e.g.*, Houston Deposition at 12. Previously, about eighteen to twenty months before the instant case, Unit VI inmates were allowed to visit the prison gymnasium at least once a month. That practice has been stopped apparently due to security reasons. Adm. Nos. 103 and 109.

Turning to the area of food service to Unit VI inmates, it is undisputed that prior to the commencement of this lawsuit, food served to inmates was cold. Houston Deposition at 38; Morris Deposition at 19; Simon Deposition at 12. Although the respondents do not keep any records on food temperature, Adm. No. 16, the evidence shows, based on the report of the respondents' agent Willie L. Bowie, Director of Food Services Management of the Department of General Services, that problems in food services, including the lack of warmth of food served in Unit VI, have been corrected by placing a steam table within the Unit. Int. No. 2 and attachments. Even though Mr. Harries and other inmates complain about the type and quality of food given to inmates, no proof on this issue exists other than the inmates subjective opinions. The Court, however, is concerned about the credible assertions of Mr. Harries that he discovered part of a mouse

in his food. At this point it appears that, to some degree, problems with food service are being addressed.

■ In the area of religious services to inmates, the respondents admit that the State of Tennessee provides no regularly scheduled religious services to death-row inmates. Int. No. 8. Commissioner Pellegrin, however, concedes that the availability of religious practice is a basic right. Pellegrin Deposition at 7 and 49. According to inmates Harries, Houston and Simon, their last religious service was Easter service of 1982. The respondents previously permitted religious counseling to death-row inmates from Frank Bainbridge and Jeff Blum, who talked to inmates individually. The respondents have ceased that practice at present, again citing security needs. It is clear beyond peradventure to this Court, however, that regular religious services are most appropriate for inmates especially those facing death. As explained by inmate Richard Simon, the availability of religious services would ease tension. Simon Deposition at 22. Moreover, the availability of religious services would be important

because with all the idle time that I have, instead of watching [TV], ... I honestly believe my time could be well-spent trying to change what got me into the penitentiary. I'm not saying the Bible would change me, but maybe it would make me a better person while I do my time.

Simon Deposition at 6. Clearly, as inmate Workman put the matter,

[A] man on death row, if anybody ... needs religious services, it would be a confined man that's going to die, to have the chance to learn more about God and learn about forgiveness and to correct and have inner peace with his soul.

Workman Deposition at 5. Thus, inmates receive no religious services or counseling from respondents and the respondents prohibit any such services from outside sources.

■ When the totality of conditions on death-row and the impact on those conditions on inmates are considered, this Court is troubled by the adverse impact the conditions exact on death-row inmates. Respondents place inmates with a sentence of death in Unit VI without any psychological or other classification or testing of the inmate. Adm. No. 46. As stated by Commissioner Pellegrin, criminal defendants sentenced to death go from the courtroom to Unit VI "without a great deal of study." Pellegrin Deposition at 9. Given that Unit VI inmates are already faced with a sentence of death, when placed in Unit VI with its adverse conditions of confinement, this Court finds convincing the assertions of death-row inmates like Ronald Harries, that they would rather be executed than endure such circumstances. As expressed by Philip Workman:

It constantly builds mental anguish, and physically not being able to exercise right deteriorates you physically. The heat, the coldness in winter, the food, it all makes a man just totally lose hope and makes a man where he would just about would rather get it all over with and go to the electric chair than continue to live in these conditions.

Workman Deposition at 5. While the Constitution does not require that the conditions of confinement be extravagent, those conditions must not physically punish the inmate or psychologically tear him down. *See, e.g., Rhodes v. Chapman,* 452 U.S. 337, 350–353, 101 S.Ct. 2392, 2401–2402, 69 L.Ed.2d 59 (1981); *Estelle v. Gamble,* 429 U.S. 97, 102–04, 97 S.Ct. 285, 290–91, 50 L.Ed.2d 251 (1976).

■ In the judgment of this Court, the conditions of confinement inflicted on Mr. Harries are so adverse that they have caused him to waive his post-conviction remedies involuntarily. By a preponderance of the evidence, the petitioners have established that the next friend petition filed on behalf of Mr. Harries is needed to protect his due process interests. Except for vague unsubstantiated assertions of security by the respondents, there is no contradiction of the evidence on conditions in Unit VI. Thus, the Court concludes that the petitioners have shown standing on their second theory—that of involuntary

waiver due to adverse conditions of confinement.

■ The Eighth Amendment prohibition against cruel and unusual punishment not only governs the conditions of confinement but also is the benchmark against which all actions involving prison inmates must be tested. As expressed in *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), the cruel and unusual punishment standard must be interpreted in a flexible and dynamic manner. *Id.* at 345–46, 101 S.Ct. at 2398 (citations omitted). The Eighth Amendment standard reaches barbaric physical punishments and any infliction of pain that cannot be justified by credible penological concerns. *Id.* at 346, 101 S.Ct. at 2398. (citations omitted). The standard draws its meaning from "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion). Such concerns of decency were considered by the court in *Autry v. McKaskle*, 727 F.2d 358 (5th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 1458, 79 L.Ed.2d 906 (1984).

In *Autry*, James David Autry was scheduled to be executed by lethal injection on October 4, 1983. At 11:00 p.m. on that date, Autry was taken to the death chamber and strapped on the gurney. Mr. Autry was connected to the intravenous tubes. At 11:33 p.m. Justice Byron White stayed the execution. However, the Texas Attorney General and Prison Warden did not inform Mr. Autry until a few minutes after 12:00 a.m. that the stay was issued, although the Attorney General learned of the stay between 11:30 and 11:35 p.m. For over one-half hour Mr. Autry lay on the gurney· anticipating his demise, unaware that the Supreme Court had stayed the execution. *Id.* at 363. Before the Fifth Circuit, Mr. Autry argued an Eighth Amendment violation arising from the delay in informing him of the stay. The appellate court rejected his argument, reasoning that the evidence did not indicate "any unnecessarily demeaning or degrading acts by the state." *Id.* Indeed, to the contrary, "the evidence [showed] that Autry was treated with the dignity due any person under the circumstances." *Id.* More critically, the Fifth Circuit found that the delay was the result of Autry's lawyers' efforts, acting on his direction. *Id.*

The *Autry* case implicitly recognized that a death-row inmate has an Eighth Amendment right to die with dignity. In the judgment of this Court the conditions of Mr. Harries' confinement are demeaning, degrading and deny him the right to die with dignity. Even if Mr. Harries was mentally competent and voluntarily waived his post-conviction remedies, the respondents are maintaining him under such conditions—notably, the lack of religious services, exercise, lighting and ventilation—so as to demean and degrade his last days. Such actions constitute wanton infliction of physical and psychological pain, which is an anathema to the standards of decency that our society demands.

### III.

In conclusion, based upon the foregoing findings of fact and conclusions of law, this Court concludes that the petitioners have proven by a preponderance of the evidence that the absence of Mr. Harries in the next friend petition is due to his mental incompetency and his involuntary waiver of post-conviction remedies due to adverse conditions of confinement. Mr. Harries' waiver of available post-conviction remedies is void and his refusal to join in the next friend habeas petition contravenes due process protections. The petitioners have proven the necessity of their petition and explained the failure of Mr. Harries to represent his interests. Accordingly, the Court concludes that the petitioners have standing. To prevent Mr. Harries from further bypassing due process protections to which he is entitled, the stay of execution previously issued by this Court is continued pending final disposition of this proceeding. The respondents' motion to dismiss this case is DENIED.