**Miriam WILSON, Nadine Schnurstein, Ronald Barrow, Gloria Abbey–Lyles and Patricia Vader, individually and as next friends acting on behalf of Charles Walker, Petitioners,**

v.

**Michael LANE, Director of the Illinois Department of Corrections, Respondent.**

No. 88–3180.

United States District Court, S.D. Illinois.

Aug. 26, 1988.

Jon K. Stromsta & Kurt H. Feuer, Ross & Hardies, Monica Rimai, Sidley & Austin, Chicago, Ill., for petitioners.

Michael Dwyer (Court-appointed), Asst. Federal Public Defender, St. Louis, Mo., for Walker.

Michael Ficaro, Kenneth A. Fedinets & Terence Madsen, Assts. Atty. Gen., Chicago, Ill., for respondent.

## MEMORANDUM AND ORDER

STIEHL, District Judge:

## INTRODUCTION

This matter is before the Court on a petition for a writ of habeas corpus. Petitioners, Miriam Wilson, Nadine Schnurstein, Ronald Barrow, Gloria Abbey–Lyles and Patricia Vader, filed their petition individually and as next-friends acting on behalf of Charles T. Walker, an Illinois death row inmate currently incarcerated at the Menard Correctional Center, Chester, Illinois.

## BACKGROUND

The Court heard oral argument on April 7, 1988, on the petition and ruled on April 19, 1988, that the petitioners could not pursue the action under either jus tertii or citizen standing doctrines. *Wilson v. Lane,* 697 F.Supp. 1489, 1494–97 (S.D.Ill. 1988). The Court left unresolved the determination as to whether the petitioners have standing to pursue the action as next-friends of Walker.

Under next-friend standing, the Court ruled that petitioners must show why Walker did not sign and verify the petition, as well as the relationship and interest of the would-be next-friends. At 1497, *citing Weber v. Garza,* 570 F.2d 511, 513–14 (5th

Cir.1978). The Court restricted next-friend standing, ruling that the petitioners may not use the next-friend petition as a device for the unauthorized practice of law. This is to prevent the creation of lay advocates who seek to right all alleged wrongs. *Id.*

As prospective next-friends, the petitioners alleged that the conditions of confinement on death row have affected Walker's capacity to freely and voluntarily exercise his rights to pursue all post-sentence remedies. After a review of *Rees v. Peyton,* 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966), and *Lenhard v. Wolff,* 603 F.2d 91 (9th Cir.), 443 U.S. 1306 (Rehnquist, J., Opinion in Chambers), stay of execution denied 444 U.S. 807, 100 S.Ct. 29, 62 L.Ed.2d 20 (1979), the Court confined the inquiry to Walker's competence or capacity to terminate his pursuit of judicial remedies. The petitioners' reliance on *Smith v. Armontrout,* 632 F.Supp. 503 (W.D.Mo.1986), *aff'd,* 812 F.2d 1050 (8th Cir.1987), and *Groseclose v. Dutton,* 589 F.Supp. 362, 594 F.Supp. 949 (M.D.Tenn.1984), was found to be misplaced, and the Court determined that the actual causes of Walker's alleged incapacity were not at issue. At 1498–99. The issue of capacity or competence was further limited by the petitioners' acknowledgement that Walker does not suffer from a mental disease or disorder. Remaining at issue was whether Walker's waiver was voluntary, or the result of a flawed mental state due to an overborne will.

The Court determined that the November 20, 1987 hearing in the Circuit Court of St. Clair County, Illinois was insufficient as a matter of law, under 28 U.S.C. § 2254(d)(1), (2), (3) and (6). The Court held that the state court hearing failed to "address the issue of whether Walker suffered from a flawed mental state due to an overborne will." Further, "the sole issue before the Court is whether Walker suffers from an overborne will which substantially affects his capacity, thereby rendering his decision to abandon further relief involuntary." At 1499–1500.

The Court stayed the scheduled execution of Walker, and determined that an

evidentiary hearing would be necessary to resolve the sole issue before the Court. Addressing the question of overborne will allows the Court to determine whether there is an acceptable reason for Walker's decision not to sign the petition. The parties were granted leave to have a psychiatrist or psychologist examine Walker as to this issue. The Court appointed its own expert, Dr. Robert E. Becker, and directed him to carry out the same inquiry and make an evaluation as to whether Walker's decision to abandon further relief was voluntary. The Court also appointed counsel to represent Walker in all proceedings before the Court.

The Court held an evidentiary hearing on August 8, 1988, and took the matter under advisement. Testifying at the hearing were Curtis L. Barrett, Ph.D., petitioner's expert; Robert E. Becker, M.D.C.M., the Court's expert; and Charles T. Walker. Respondent chose not to have an expert examine Walker. Both experts filed written reports with the Court.

## THE ISSUE OF VOLUNTARINESS

The inquiry before the Court concerns the voluntariness of Walker's decision. The original petition relied on the *Groseclose* decision, and attempted to frame the issue in terms that the conditions of Walker's confinement rendered any decision he made involuntary. The Court, however, refused to review the conditions, per se, and determined that the threshold question was simply whether Walker's decision not to pursue further legal remedies was made voluntarily. As the Court in *Groseclose* stated, "a defendant's conduct is not voluntary if it is the result of an overborn will or the product of an impaired self-determination brought on by the exertion of any improper influences." 594 F.Supp. at 957.

In its prior Order, this Court determined that the voluntary issue would be reviewed under the capacity test set forth by the Supreme Court in *Rees v. Peyton*, 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966). At 1499. The *Rees* Court established the following standard:

[W]hether he has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand is suffering from a mental disease, disorder or defect which may substantially affect his capacity in the premises.

*Id.* at 314, 86 S.Ct. at 1506. To that extent, the Court determined that petitioners must make a "successful attack on [Walker's] capacity to make a voluntary decision" in order to meet the threshold standing required to go forward with their petition. At 1499.

Petitioners bear the burden of proving, by a preponderance of the evidence, that Walker lacks the requisite capacity to waive further legal review. *Accord, Evans v. Bennett*, 440 U.S. 1301, 99 S.Ct. 1481, 59 L.Ed.2d 756 (1979); *Gilmore v. Utah*, 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976); *Rees v. Peyton*, 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966); *Lenhard v. Wolff*, 603 F.2d 91 (9th Cir.), stay of execution denied 444 U.S. 807, 100 S.Ct. 29, 62 L.Ed.2d 20 (1979).

### A. "OVERBORNE WILL"

The Court was presented with the evaluations of two mental health experts. Dr. Barrett determined that Walker is a chronic alcoholic who has not received successful treatment for his alcoholism. Based on this, Barrett determined that there is a "substantial probability that [Walker's] waiver of his rights to further appeal is indeed a product of 'overborne will,' as I understand that term." Report of Dr. Barrett at pp. 4–5. Dr. Becker concluded that Walker exhibited no evidence of diminished mental capacity. He found Walker to be "capable of deciding not to appeal his death sentence." Report of Dr. Becker at p. 6.

Both experts testified that they were unfamiliar with the concept of "overborne will" in a medical sense. Both, however, were able to formulate definitions for this term. Dr. Barrett described overborne will as something "that might lead a person not to be able to direct his own behavior in a logically consistent and self-serving way." (Tr. p. 18) Dr. Becker concluded that he

had to determine whether there were "psychological internal factors in him that were causing him to reach this decision or whether there were external environmental effects of the institutionalization that might be forcing him in some way to reach this decision." (Tr. p. 96). The Court is satisfied that both experts properly focused their evaluations on the voluntary nature of Walker's decision.

## B. FINDINGS OF THE EXPERTS

Dr. Barrett is a clinical psychologist and Professor of Psychiatry at the University of Louisville. He is board certified and has specialized in addictive behaviors. He evaluated Walker on two consecutive days. As part of the examination, he performed a mental status examination and gave Walker a life history questionnaire, a sentence completion test and requested that Walker write a personal autobiography. Dr. Barrett stated several times that he began his evaluation of Walker with the premise that persons who are incarcerated in difficult circumstances are presumed to want to live and do not choose to die. As an example of this, Dr. Barrett discussed the will to live exhibited by prisoners of war. Dr. Barrett stated that the Vietnam POW's "kept trying to live even though subjected to horrible tortures and horrible living circumstances."

Dr. Barrett concluded that Walker suffers from chronic, untreated alcoholism, but found that Walker does not suffer from any mental disease, defect or disorder, including organic brain disorder due to acute alcoholism. Dr. Barrett found that due to the fact that Walker's alcoholism has remained untreated, he suffers from a "self-will run riot." Dr. Barrett determined that there was a "substantial probability" that Walker's decision not to challenge his death sentence is based on the effects of his untreated alcoholism, and that this impinges on the voluntary nature of his waiver. Walker's decision was characterized as one made in a "logic-tight" compartment. That is, Walker is impervious to input from external sources. Dr. Barrett found Walker to exhibit grandiose perceptions.

Dr. Barrett based his diagnosis of chronic alcoholism on the diagnostic scale set forth in the DSM-IIIR. He found that Walker had had a drinking problem from an early age, and under the MacAndrews scale on the Minnesota Multiphasic Personality Inventory (MMPI), is properly categorized as an alcoholic. Dr. Barrett stated that Walker may suffer from a personality disorder; however, it is so entwined with his alcoholism that it could not be diagnosed without treatment. It was his opinion that only after successful therapy would Walker move away from the "logic-tight" thinking and exhibit a more rational thought process about his decision to waive further review. A minimum of one year's therapy would be necessary before a determination could be made by any expert as to the voluntary nature of Walker's decision.

Dr. Becker is Professor and Chairman of the Department of Psychiatry, Southern Illinois University at Springfield, Illinois. He is board certified in psychiatry, and has an extensive publication history in that field. Dr. Becker examined Walker, as well as Gary Knop, guard captain for the detention unit, and David Elam, Walker's counselor. He concluded that Walker suffers from an antisocial personality disorder. Dr. Becker conducted a mental status examination on Walker and found no evidence of impairment of either memory or intelligence. He found Walker to have a skewed thought process, which is in keeping with a diagnosis of antisocial personality disorder. Dr. Becker observed Walker to be matter-of-fact in his attitudes and definite in the expression of his opinions. Walker evidenced no depression or grandiose behavior. He determined that Walker was neither an acute nor chronic alcoholic. This finding was based on the fact that Walker has not used alcohol for the past five years, and has had long periods, when not incarcerated, when he chose not to use alcohol.

Dr. Becker agrees with Dr. Barrett that some of Walker's characteristics are common among alcoholics, and that he could be labeled by the DSM-IIIR under the sub-

stance abuse category. He found, however, that Walker's use of alcohol is related to his antisocial personality. Dr. Becker agreed that Walker clearly abuses alcohol. However, Walker's characteristics did not all meet a diagnosis of alcoholism. He found that an antisocial personality disorder diagnosis was the best explanation for the following: Walker's pattern of behavior, his functioning as an individual, and his method of selecting his courses of action. Dr. Becker found no evidence of dependence on alcohol, psychologically or physiologically, and determined that Walker used alcohol as a convenient way of dealing with his feelings when he found himself in certain situations. Dr. Becker stated: "Antisocial people use everything the way they want. They use their bodies and other people the way they want. The alcohol abuse is the general way he views life; Charles Walker first and the chips where they fall later for other people." (Tr. p. 129).

Dr. Becker found Walker to be mentally capable of making his own decisions. He found no evidence of alcoholism nor of conditions of confinement that would interfere with Walker's ability to voluntarily waive his right to further review of his death sentence. Dr. Becker stated that there was no nexus between being an alcoholic or substance abuser and an ability to waive rights. He found this to be true as it applied to both the general population and to Walker.

## FINDINGS AND CONCLUSIONS

The Court initially notes that Walker's behavior and decision-making process which Dr. Barrett considers to be the result of chronic alcoholism could also be the result of an antisocial personality, as Dr. Becker states. Whether termed "self-will run riot" or a "logic-tight compartment," one does not have to be a chronic alcoholic to exhibit the behavior described in these phrases.

Dr. Becker's report offers a more reasonable explanation of Walker's actions, and the Court finds Dr. Becker to be the more credible expert. Simply put, Walker has an antisocial personality, and makes decisions consistent with that personality. His lack of regard for advice of attorneys, for instance, although potentially viewed as "self-will run riot," is more likely the characteristic of an individual who simply has a lack of regard for any other persons' opinions or needs. Walker's matter-of-fact description of the murders he committed shows that he places little value on human life, as does his relative lack of remorse over the killings. His failure to distinguish between guilt in his mind and guilt under the law cannot be considered the result of a flawed mental state, per se. It simply shows that Walker considers his actions in terms of his needs, without regard for their propriety in the eyes of the law.

Furthermore, to accept Dr. Barrett's conclusion would be to place any waiver made by a potential alcoholic in question. This would include waiver of right to trial by jury, waiver of Miranda rights, or the waiver of the right to an appeal.

This Court determined in its prior opinion that, other than the issue of a potentially overborne will, the state court determinations of Walker's capacity were sufficient. Included in the state court determinations was the finding that Walker knowingly waived his right to a jury trial. The state court proceedings also included extensive testimony concerning Walker's use of alcohol. The experts concluded that his use of alcohol did not affect his waiver of his right to a jury trial or his right to further review. *See*, Tr. Nov. 20, 1987 Hearing (Dr. Shuman, p. 18; Dr. Cuneo, p. 59, Dr. Taliana pp. 85–86). The court, after review of the testimony concerning the use of alcohol, found Walker competent to waive his rights to further review and fit to be executed. Therefore, the issue of acute alcoholism was competently covered by the state court, and, pursuant to 28 U.S.C. § 2254, is not before this Court.

The Court had the opportunity to examine Walker on the stand at the August 8th hearing. Walker testified that he still desires not to pursue any further review of his sentence. He told the Court that he had made this decision, and had told his

family of it on the night before he was sentenced. He has not wavered in that decision at any time since.

The Court found him to be credible, lucid, and rational in his testimony. He stated that he would not change his opinion even if he were guaranteed an opportunity for pardon at age 70 or 75. He understood the federal review options available to him, and was aware of the efforts being made on his behalf by the petitioners. He stated that it was not the lack of medical care, the conditions of his confinement, or the counseling available that were the determining factors in his decision. He drew a very perceptive distinction between his situation and that of POW's. He stated, "They [POW's] can have a hope and a dream of being free. I can't. See, so it's two different sets of circumstances." (Tr. p. 155). Walker said that there was "no possibility, hope or dream" of being a free man, and that there was no sense in being imprisoned for 10–25 years and then dying, when the end result would be the same—death.

### CONCLUSION

The Court finds that petitioners' original basis for their petition, that the conditions of confinement have caused Walker's will to be overborne, rendering his decision involuntary, is without merit. Neither expert found any environmental factor that affected Walker's capacity to make a voluntary waiver. Walker himself did not have any serious complaints about the conditions of confinement. The Court finds that Walker's decision is, in part, based on the quality of his life due to the fact, not conditions, of confinement and the sheer lack of the possibility of freedom during his lifetime. He expressed a reasoned, logical and acceptable desire not to lay in a "cage" and die an old man in that "cage."

Having considered the opinions of the medical experts together with Walker's testimony, the Court finds that the petitioners have failed to prove by a preponderance of the evidence that Charles T. Walker suffers from a flawed mental state due to an overborne will. Walker's waiver of the right to further review was made freely

and rationally. Under the totality of the circumstances, Walker's decision is the product of both rational intellect and unconstrained will. *Accord, Haynes v. Washington,* 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); *Culombe v. Connecticut,* 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961). The Court further finds that Charles T. Walker has the capacity to knowingly waive his right to further review of his death sentence, and the same is done voluntarily. *Rees v. Peyton,* 384 U.S. at 314, 86 S.Ct. at 1506.

Accordingly, the petition for a writ of habeas corpus is DENIED and this cause of action is, therefore, DISMISSED. The stay of execution heretofore ordered by the Court is continued in full force and effect pending appeal.

IT IS SO ORDERED.