James David AUTRY,
Petitioner-Appellant,

v.

Dan V. McKASKLE, Acting Director,
Texas Department of Corrections,
Respondent-Appellee.

No. 84-2083.

United States Court of Appeals,
Fifth Circuit.

March 1, 1984.

---

Stefan Presser, E. Larry Cantu, Greater Houston ACLU, Houston, Tex., for petitioner-appellant.

Jim Mattox, Atty. Gen., Leslie A. Benitez, Asst. Atty. Gen., Austin, Tex., for respondent-appellee.

Before CLARK, Chief Judge, POLITZ and HIGGINBOTHAM, Circuit Judges.

PER CURIAM:

Autry seeks in his third federal habeas application a certificate of probable cause and stay of execution. Persuaded that there is neither a "question of substance" nor a "substantial showing of the denial of [a] federal right" the application is denied. *Barefoot v. Estelle*, —— U.S. ——, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983).

I

We affirmed denial of Petitioner's First Application for Habeas Relief in June 1983. *Autry v. Estelle,* 706 F.2d 1394 (5th Cir. 1983). The Supreme Court denied Autry's request for stay on October 3, 1983, *Autry v. Estelle,* —— U.S. ——, 104 S.Ct. 20, 78 L.Ed.2d 1 (1983). That same day, and the day before his scheduled execution, Autry filed his second federal habeas petition. This second petition alleged ineffective assistance of counsel at trial, the unconstitutionality of the Texas death penalty statute, and the absence of an assertedly required proportionality review. On the following day, the district court conducted an evidentiary hearing and denied a certificate of probable cause and stay of execution. After oral argument conducted by a conference telephone call, this panel also refused a certificate of probable cause and stay of execution. *Autry v. Estelle,* 719 F.2d 1247 (5th Cir.1983). Within minutes, and minutes before the planned execution, Justice White granted a certificate of probable cause and stay of execution. *Autry v. Estelle,* —— U.S. ——, 104 S.Ct. 24, 78 L.Ed.2d 7 (1983). Justice White explained that his order was compelled by the grant of plenary review in *Harris v. Pulley,* 692 F.2d 1189 (9th Cir.1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 1425, 75 L.Ed.2d 787 (1983), in which the ninth circuit had held that proportionality review was a constitutional requirement.

Anticipating that resolution of the proportionality issue would not be forthcoming for some months, we remanded the case to the district court to allow Autry an opportunity to present all claims he might have and for any evidentiary hearing required to

decide any new claims as well as to supplement the record regarding his earlier presented claims. In remanding we explained that our action was not required by any found deficiency in the most recent evidentiary hearing but was to afford a death sentenced prisoner every opportunity to present his claims consistent with the interest of the state, the balance of which had changed with the issued stay.

On January 19, 1984 the district court conducted a third evidentiary hearing taking the testimony of numerous witnesses including Autry, his mother and his former counsel. On January 23, 1984 the Supreme Court rejected the contention that a proportionality review was constitutionally required. *Pulley v. Harris,* —— U.S. ——, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Autry then abandoned his claim that Texas was required to conduct such a review in his case.

Autry has two remaining claims. First, Autry claims that he was denied effective assistance of counsel at the sentencing phase of his trial in that his counsel failed "to present any evidence in mitigation of punishment at the penalty stage of the proceedings." Relatedly, if Autry prevented the development of his case at the sentencing phase by a preference of death over a long prison term, counsel was ineffective in not requesting an inquiry into Autry's competence. Second, Autry claims that he was subjected to cruel and unusual punishment on the night of October 4, 1983 when he was "placed on the gurney an entire hour prior to the time when respondent had a legal entitlement to end his life ... and ... was misled into believing that a stay had in fact not been obtained and that his death was therefore imminent ... amount(ing) to psychological torture."

## II

■ Autry enjoyed the constitutional right to an effective lawyer at all stages of his trial including the sentencing phase. Its measure is "not errorless counsel and not counsel judged ineffective by hindsight, but counsel reasonably likely to render and ren-

dering reasonably effective assistance." *Washington v. Watkins,* 655 F.2d 1346, 1355 (5th Cir.), *rehg denied,* 662 F.2d 1116 (1981). While this has been the base principle in this circuit, the precise formulation of the measure is now uncertain, being at issue in two cases argued on January 10, 1984 before the Supreme Court: *Washington v. Strickland,* 693 F.2d 1243 (5th Cir.1982) (en banc), *cert. granted,* —— U.S. ——, 103 S.Ct. 2451, 77 L.Ed.2d 1332 (1983), and *United States v. Cronic,* 675 F.2d 1126 (10th Cir.1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 1182, 75 L.Ed.2d 430 (1983). As we will explain we do not encounter this uncertainty in deciding this appeal.

■ Autry argues that his lawyer failed to conduct an independent investigation into possible witnesses at the sentencing phase. More specifically, Autry argues that his lawyer did not develop witnesses who might have testified to Autry's family background, and offered no evidence at the sentencing phase in addition to that offered at the guilt phase. Autry urges that evidence was available that "petitioner was a person much loved by family," that both his parents were alcoholic and "of even greater importance the violent and demeaning relationship he was forced to suffer at the hands of his father."

The state replies that by any measure Autry's counsel was effective because Autry did not want his lawyer to fight the death penalty, as Autry preferred death to life imprisonment, and that, while counsel attempted to locate witnesses, Autry made the decision that the mitigating circumstances of his troubled youth not be put before the jury. In short, the state replies that Autry's present charge is flawed by the fact that he would not allow his counsel to so develop his sentencing case.

Autry's trial counsel, Charles Carver, testified at length before the district court at the October 4, 1983 and January 19, 1984 hearings. Carver testified that Autry gave him the names of five persons for possible use in the sentencing phase. Three were members of Autry's family and two were family members of his codefendant who

negotiated a plea agreement. Carver explained that he wrote to each identifying himself as Autry's lawyer and asking them to contact him. The difficulty was, as Carver explained it, that

> ... he informed me prior to ever going to trial as to his desires and intentions, that if he was found guilty, he wanted to take the stand and tell the jury he wanted the death sentence as opposed to a life sentence.

Carver testified that the conversation occurred while he was preparing for trial, but that he thought Autry would change his mind. He explained that he explored Autry's childhood and upbringing with Autry and Autry's mother—including Autry's relationship with his father—and looked to them as his testimonial sources. His plan was to put Autry's mother on the stand, but his strategy could not be implemented because of Autry's strong resistance to a life sentence. As Carver put it: "this was his strong moving force behind not wanting a life sentence even though one was offered to him and even though later on, a forty-year sentence was offered to him. He turned that down."

At the January 1984 evidentiary hearing Autry denied either forbidding Carver to put his mother on the stand or choosing a death penalty over a long prison term. Instead he claimed that he gave a list of potential witnesses to Carver and that Carver did not discuss the sentencing phase with him. Autry's mother supported her son, disputing Carver's testimony that he had told her of his difficulty with Autry. With this stark conflict in the testimony the district court found:

> Charles Carver testified that Autry had told him that he would ask the jury for the death penalty if he testified, preferring death to life imprisonment. Carver further testified that Autry refused to permit his mother to testify. At the hearing on January 19, 1984, Autry testified that he had not made these statements to Carver. Moreover, contrary to what Carver testified, Autry's mother testified that Carver never informed her of Autry's statements regarding his de-

sire to die rather than serve a life term. *The Court finds Mr. Carver's testimony to be truthful, accurate, and supported by the record as a whole. Conversely, the Court finds the testimony of Petitioner and his mother to be false and contrived. In addition to Mr. Carver's credibility as a witness, the Court believes that Petitioner's rejection of all plea bargain offers permits an inferentially drawn conclusion that Petitioner preferred the risk of a death sentence to the certainty of an extended term of imprisonment.* This conclusion is consistent with Mr. Carver's testimony. In sum, the Court rejects as baseless petitioner's claim that Mr. Carver failed to represent Autry effectively during the sentencing phase of his capital trial. (emphasis supplied)

Faced with conflicting testimony, we cannot conclude that this finding is clearly erroneous. It follows that at least the first wing of Autry's claim of ineffective assistance of counsel must fail. This is so despite the pending review in *Washington v. Strickland* and *United States v. Cronic.* By no measure can Autry block his lawyer's efforts and later claim the resulting performance was constitutionally deficient. So far this argument is little more than was before us on the eve of execution, save the added flesh of a more complete factual development made possible by the absence of the time constraints of an imminent scheduled execution.

But Autry's present counsel says there is yet another failure in Carver's trial performance. If Carver's testimony be credited over that of Autry and his mother, as it was, Carver, it is now urged, ought to have pressed for an inquiry into the mental competence of Autry. The argument is that the fact Autry would prefer death over a long prison term alone puts his competence at issue. We are unpersuaded.

Autry offered the testimony of Will Gray at the January 1984 evidentiary hearing in support of his contentions that Carver was ineffective. Gray, a lawyer long active in death penalty cases, explained the impor-

tance of the sentencing phase. While Gray expressed the opinion that Carver ought to have requested a competency hearing, he also testified that all of his some sixty clients who faced the death penalty made unreasonable demands and that it was not unusual for them to request execution, although they usually changed their minds as the execution moved from the possible to the probable.

Autry also admitted that shortly before his scheduled execution he drafted a letter to Carver which he gave to a priest with instructions to mail it after the execution, and that when the execution aborted he told the priest to go ahead with the mailing. In the letter Autry denied participation in the effort to find Carver ineffective or that Carver failed to do what he ought to have done. Autry states in the letter that: "You done what I asked of you on my second part of my trial." We mention the letter to make the point that nothing in this record reflects any change in the level of Autry's rationality or in the voluntary and knowing character of his decision, in the three years since trial. And no one, not even his present counsel, offers any evidence that Autry is, or was, incompetent.

■ A state may require reasonable proceedings to protect its own interest in integrity of process, and may refuse to allow a defendant to avoid an appeal required by state law in death cases. *Massie v. Sumner,* 624 F.2d 72 (9th Cir.1980). It is often contended that the state should not be a party to a suicide. But in this case any truncation of process or frustration of state required procedures was at most tangential. Instead, in an otherwise hard fought case, Autry refused to allow his counsel to proceed on a tactical course that might have conferred substantial benefit, and, in the case of the refused plea bargain, would have avoided the risk of a death sentence. A competency hearing is not an automatic condition for accepting such decisions. Indeed the Supreme Court has allowed a pro

se withdrawal of a petition for writ of certiorari filed by a death-sentenced prisoner, with no inquiry into competence in face of counsel's failure to question his client's competence. *Hammett v. Texas,* 448 U.S. 725, 100 S.Ct. 2905, 65 L.Ed.2d 1086 (1980). At the same time, the Supreme Court has refused pro se withdrawal of a petition for writ of certiorari absent a competency hearing when counsel questioned his client's competence and supported his concern with a report by an examining psychiatrist who found him incompetent. *Rees v. Peyton,* 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1965). It does not follow for us that refusing to plead for mercy after being convicted of two execution-style slayings will *alone* so implicate a defendant's competency as to render his counsel constitutionally ineffective for not seeking an inquiry into competency before abiding the client's decision. There is no other evidence from trial or from the post-conviction evidentiary hearings that raises questions about Autry's competence. The United States District Judge found no suggestion of incompetence after reviewing the entire trial record and listening to the testimony of Autry and all the witnesses. Those witnesses included the priest who attended Autry on the eve of his aborted execution, Autry's mother and prison officials. None suggested that Autry was or is other than competent.

While categorization of decisions as the personal choices of a criminal defendant or the tactical choices of counsel is not always an easy task, *cf. Jones v. Estelle,* 722 F.2d 159 (5th Cir.1983) (en banc) the United States District Court found that Autry made the decisions he now charges his lawyer incompetently made. If Autry knowingly made the choices, Carver was ethically bound to follow Autry's wishes. *Foster v. Strickland,* 707 F.2d 1339, 1343 (11th Cir. 1983) (decision of attorney to abide his client's wishes and not to present depraved mind theory of second degree murder held not ineffective.)[1] Significantly, that the

---

1. The American Bar Association Standards Relating to the Defense Function (tent. draft 1970) provide:

5.2 Control and Direction of the case.

. . . .

decision was a knowing one is supported by the testimony of Carver and by Autry's own letter written on the eve of his aborted execution.

■ In sum, Carver was not ineffective in not seeking a competency hearing before abiding Autry's decision, absent a more substantial reason to suspect incompetence than the lawyer's view that Autry's decision was injurious to the case. As did the district court, we agree with the expression in *Lenhard v. Wolff*, 443 U.S. 1306, 1312–13, 100 S.Ct. 3, 6–7, 61 L.Ed.2d 885 (1979) (Rehnquist, J., in chambers):

> The idea that the deliberate decision of one under sentence of death to abandon possible additional legal avenues of attack on that sentence cannot be a rational decision, regardless of its motive, suggests that the preservation of ones own life at whatever cost is the *summum bonum,* a proposition with respect to which the greatest philosophers and theologians have not agreed and with respect to which the United States Constitution by its terms does not speak.

### III

■ The second claim, that of an eighth amendment violation stemming from Autry's near execution on October 4, 1983, is frivolous. The district court found that Autry was taken to the death chamber around 11:00 p.m., strapped on the gurney and connected to the intravenous tubes, and that Justice White's stay was issued at 11:33 p.m. (C.D.T.). The found chronology was:

> (1.) Between 11:30–11:35 p.m. (C.D.T.) Assistant Attorney General Benetiz [sic] received a phone call from a Deputy Clerk of the United States Supreme Court advising her that Justice White had issued a stay;
>
> (2.) Benetiz [sic] relayed this information to Attorney General Mattox at the

prison in Huntsville, Tex., where the execution was to take place;

> (3.) Within five (5) minutes, the Attorney General informed Assistant Warden Peterson, who, in turn, told Warden Pursely, who was in the execution chamber, that a "hold" had been placed on the execution. The Attorney General, however, did not, at that time, tell them that a stay had been issued. Because Warden Pursely was uncertain regarding the meaning of the term "hold," Autry remained on the gurney;
>
> (4.) In the meantime, Attorney General Mattox and Assistant Attorney General Benetiz [sic] considered the potential for a hearing by the entire Supreme Court to vacate Justice White's stay;
>
> (5.) After determining that such a course of action was not feasible—and no later than 12:15 a.m. (C.D.T.) by Autry's own estimation, 12:03 a.m. (C.D.T.) by the State's estimation, or somewhere in between by the clergyman present—Autry was informed of the stay, removed from the gurney and returned to his cell.

As noted by the district court, there is no evidence that any infliction of distress upon Autry was other than the inevitable pain accompanying a last minute stay. There was no evidence of any unnecessarily demeaning or degrading acts by the state. As the district court found, the evidence shows that Autry was treated with the dignity due any person under the circumstances. Finally, the district court found that "petitioner's suffering is attributable to his own counsel's manufactured time constraints." The court found that Autry's counsel, who continue to represent Autry, represented to this panel that no petition to the Supreme Court was planned, and that, given the difficulty of obtaining last minute review by the Supreme Court, the court of appeals was by their choice the court of last resort

---

(c) If a disagreement on significant matters of tactics or strategy arises between the lawyer and his client, the lawyer should make a record of the circumstances, his advice and reasons, and the conclusion reached....
By the standards, the preferred practice was for Carver to make a record of Autry's deci-

sion. While Autry did later write the letter suggested by Carver, the absence of a formal contemporaneous record left Carver open to the charges here made. Regardless of its wisdom when viewed in hindsight, the failure to follow the standard in this respect was here no constitutional violation.

for that appeal. This was indeed the representation made in oral argument. Its practical result, as all counsel understood at the time, was to induce this panel to take the time to prepare and file a written opinion. By accepting counsel's representation and following this course, the panel unwittingly delayed the request to Justice White for a stay. In sum, the state is not chargeable with any confusion or uncertainty or hesitancy that preceded Autry's removal from the gurney. It follows that the state did not deprive Autry of any constitutionally secured right in its manner of starting and aborting the execution process.

The decision of the district court is AFFIRMED and the application for a certificate of probable cause and stay of execution is DENIED.