# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 30, 2011

Lyle W. Cayce
Clerk

No. 10-70020

JAN MICHAEL BRAWNER,

Petitioner - Appellant

v.

CHRISTOPHER B EPPS, COMMISSIONER, MISSISSIPPI DEPARTMENT OF CORRECTIONS,

Respondent - Appellee

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 2:07-CV-16

Before BENAVIDES, PRADO, and SOUTHWICK, Circuit Judges.

PER CURIAM:[*]

Jan Michael Brawner, Jr. challenges the district court's denial of habeas relief. He seeks a certificate of appealability for this court to review his claims of ineffective assistance of counsel and the discriminatory striking of a juror. The motion is DENIED.

## FACTUAL AND PROCEDURAL HISTORY

On April 25, 2001, Jan Michael Brawner shot and killed four people in Tate County, Mississippi. He was arrested the next day and charged with four

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-70020

counts of capital murder.  Brawner pled not guilty and presented an insanity defense.  A jury convicted him on all counts and sentenced him to death.

Brawner's convictions and sentence were affirmed on direct appeal by the Mississippi Supreme Court.  *Brawner v. State*, 872 So. 2d 1 (Miss. 2004) [*Brawner I*].  That court later denied Brawner's petition for post-conviction relief. *Brawner v. State*, 947 So. 2d 254 (Miss. 2006) [*Brawner II*].  In January 2007, Brawner filed an application under 28 U.S.C. Section 2254 with the United States District Court for the Northern District of Mississippi.  The court denied relief.  *Brawner v. Epps*, No. 2:07-CV-16, 2010 WL 383734 (N.D. Miss. Jan. 27, 2010); *see also Brawner v. Epps*, No. 2:07-CV-16, 2010 WL 2090327 (N.D. Miss. May 21, 2010) (denial of motion to amend judgment).  These opinions contain a full recounting of the facts and proceedings in this case.  Consequently, our restatement of the facts will be limited.

The district court declined to issue a certificate of appealability ("COA"). Brawner then timely moved in this court for a COA on two issues: (1) whether his trial attorneys were constitutionally ineffective in their failure to investigate mitigating evidence, and (2) whether the prosecutor committed constitutional error in using a peremptory strike to remove a pregnant juror.  We refuse to grant a COA on either issue.

## DISCUSSION

Federal habeas review of state convictions is governed by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA").  *See* 28 U.S.C. § 2254. This court must be "highly deferential" to state court rulings.  *Paredes v. Thaler*, 617 F.3d 315, 318 (5th Cir. 2010) (citation omitted).  We analyze whether the final state court's resolution of each claim was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was

No. 10-70020

based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).

"Claims of ineffective assistance of counsel involve mixed questions of law and fact and are governed by § 2254(d)(1)." *Gregory v. Thaler*, 601 F.3d 347, 351 (5th Cir. 2010) (citation omitted). A state court decision is an unreasonable application of the law when it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 352 (citation and quotation marks omitted). Under this standard, we will not issue a writ solely because we conclude the state court made an erroneous decision. *Paredes*, 617 F.3d at 319. That decision must be "so clearly incorrect that it would not be debatable among reasonable jurists." *Murphy v. Johnson*, 205 F.3d 809, 813 (5th Cir. 2000) (citation and quotation marks omitted).

Claims of discriminatory juror selection present pure questions of fact that are reviewed under Section 2254(d)(2). *Rice v. Collins*, 546 U.S. 333, 338 (2006). Under this standard, the state court findings of fact are presumed to be correct, and the petitioner has the burden of rebutting the presumption of correctness by "clear and convincing evidence." *Id.* at 338-39 (quoting 28 U.S.C. § 2254(e)(1)). "Deference does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

If either part of Section 2254(d) is satisfied, a habeas petitioner must also show that the claimed error resulted in "actual prejudice," meaning the error "had substantial and injurious effect or influence in determining the jury's verdict." *Paredes*, 617 F.3d at 319 (citation and quotation marks omitted).

Before such claims can be considered on the merits, a habeas petitioner must obtain a COA to appeal to this court. *Williams v. Thaler*, 602 F.3d 291, 300 (5th Cir. 2010); *see* 28 U.S.C. § 2253(c)(1)(A). A petitioner is entitled to a COA when he makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The petitioner "must demonstrate that reasonable jurists

3

could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Williams*, 602 F.3d at 301 (citation and quotation marks omitted). The COA determination

> requires an overview of the claims in the habeas petition and a general assessment of their merits. We look to the District Court's application of AEDPA to petitioner's constitutional claims and ask whether that resolution was debatable amongst jurists of reason. This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims. In fact, the statute forbids it.

*Miller-El*, 537 U.S. at 336. When the petitioner "faces a sentence of death, we must resolve any doubts as to whether a COA should issue in his favor." *Williams*, 602 F.3d at 301 (citation and quotation marks omitted).

As to Brawner's ineffective assistance of counsel claim, we consider whether jurists of reason could debate the district court's determination that the Mississippi Supreme Court's resolution was not an unreasonable application of clearly established federal law. As to Brawner's claim of discriminatory juror striking, we consider whether jurists of reason could debate the district court's determination that the Mississippi Supreme Court's resolution was not an unreasonable determination of the facts.

I.      *Ineffective Assistance of Counsel*

    A.      *Background and the Parties' Arguments*

At trial, Brawner was represented by David Walker, Tate County's part-time public defender. Walker was assisted by a law clerk, Tommy Defer, who at the time had graduated from law school but failed the bar exam. He later passed the exam and was sworn into practice the morning of Brawner's trial. He was immediately appointed co-counsel for Brawner. Defer cross-examined four witnesses during the guilt phase of the trial.

No. 10-70020

An ineffective assistance of counsel claim is to be evaluated by examining whether the attorney acted reasonably "considering all the circumstances." *Strickland v. Washington*, 466 U.S. 668, 688 (1984).

> Prevailing norms of practice as reflected in American Bar Association standards and the like, e.g., ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) ("The Defense Function"), are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

*Id.* at 688-89. We will examine similar standards to guide us.

Brawner's central argument for ineffective assistance is that neither Walker nor his unlicensed law clerk investigated mitigating evidence that could have been presented at the sentencing phase. Brawner alleges that the law clerk had been delegated the responsibility to prepare for the sentencing phase but itemized only 92.5 hours of work on the case, 39 of which were spent in the multi-day trial. The clerk allegedly spent no time investigating mitigating evidence. (Walker did not keep time records.) In addition, Brawner alleges that his trial team did not request or otherwise utilize an investigator or mitigation specialist as recommended by the American Bar Association Guidelines then in effect. *See* Am. Bar Ass'n Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases § 11.4.1(D)(7) (1989) ("ABA Guidelines"); *see also id.* § 8.1 cmt.

As a result of these failures, Brawner claims he was denied counsel under *United States v. Cronic*, 466 U.S. 649 (1984), or in the alternative denied effective assistance of counsel under *Strickland*.

Brawner contends that a thorough investigation of mitigating evidence and presentation of such findings to the jury during the sentencing phase could

have persuaded a reasonable juror not to impose the death penalty. The district court summarized the mitigating evidence as including:

> (1) a prior diagnosis of depression and Post Traumatic Stress Disorder ("PTSD"); (2) that [Brawner] suffers from a learning disorder; (3) that his family moved frequently due to their financial woes brought on by drug and alcohol abuse; (4) that he was exposed to drug and alcohol abuse; (5) that he and his sister were exposed to physical abuse; (6) that as a child he received beatings to keep him silent when he witnessed his father repeatedly rape his younger sister; (7) that he was admitted to Parkwood Hospital at the age of fourteen for huffing gasoline and was diagnosed with Polysubstance Abuse; (8) that his school records reflect a marked drop in performance during the height of abuse in the home; and (9) . . . that he ultimately dropped out of school in the ninth grade and failed to obtain his GED.

*Brawner*, 2010 WL 383734, at *6 (omitting footnote stating Brawner's father was convicted of sexually battering Brawner's sister and served 7.5 years at the Mississippi State Penitentiary). Brawner also claims additional mitigating evidence would be found in "the circumstances of his marriage and divorce" – which was finalized the month before the murders – and the multiple car accidents Brawner had the year before the murders, which may have caused brain damage. *Id.* at *7.

In response, the State of Mississippi argues that Brawner at all times was represented by a licensed attorney. The State also contends that Brawner waived his right to a thorough investigation of mitigating evidence by repeatedly requesting the death penalty. Therefore, it argues, Brawner was not prejudiced by any failure to investigate mitigating evidence.

The state trial court record reveals that Brawner was questioned carefully on the record several times about issues relevant to this appeal. Brawner was asked whether, should the jury return a guilty verdict, he wanted defense counsel to put on a case in mitigation that might cause the jury to sentence him

to life without parole.   Counsel stated that the witnesses would include Brawner's mother to discuss his difficult childhood, and a psychiatrist to testify as to her findings.   Brawner responded that "I don't feel I deserve to live." Additional on-the-record comments from Brawner appear in the Mississippi Supreme Court's opinion that denied post-conviction relief. *Brawner II*, 947 So. 2d at 263-64.  Among the more relevant excerpts are comments from his counsel that counsel had never previously failed to put on a case in mitigation and had recommended to Brawner that one be offered for him.   Brawner then had explained to him on the record that a capital case consisted both of a guilt phase and one on sentencing.  Brawner agreed with his counsel's question that he did not "wish to call your mother as a witness [at guilt] because she knows nothing about the facts that I could bring out and your desire is that she not testify before the jury and beg you to get life or life without parole." *Id.* at 263.

B.     *The State Court's Resolution*

The Mississippi Supreme Court denied Brawner's ineffective assistance claim. "Trial counsel did not present mitigating evidence at sentencing, despite the fact that there were at least three witnesses willing to testify . . . ." *Id.* The attorney's decision was based on "Brawner's choice not to have these witnesses testify." *Id.*

After reviewing and quoting the trial transcripts, the court found that Brawner had repeatedly sought the death penalty and "made an informed decision" to waive his attorney's presentation of mitigating evidence. *Id.* at 264.

> Our own law does not require trial counsel to go against the fully informed and voluntary wishes of his client to refrain from presenting mitigating evidence. *Burns v. State*, 879 So.2d 1000, 1006 (Miss.2004). Counsel will not be deemed ineffective for following his client's wishes, so long as the client made an informed decision. *Dowthitt v. Johnson*, 230 F.3d 733, 748 (5th Cir.2000). A defendant may not block his lawyer's efforts and later claim the resulting performance was constitutionally deficient. *Id.*

Brawner was fully apprised of the consequences of his choice. He made an informed and voluntary decision not to present mitigating evidence. Trial counsel prepared a mitigation case but did not present it based on Brawner's wishes, despite contrary recommendations. Trial counsel's recommendations and the prosecution's recommendation advised Brawner of the gravity of his choice. We cannot now find that trial counsel was ineffective for failing to put on mitigating evidence. To do otherwise, would allow Brawner to create ineffectiveness.

*Id.* at 264 (paragraph numbering omitted). The federal district court held the state court's resolution to be a reasonable application of clearly established law.

The Mississippi Supreme Court did not explain its reasoning in rejecting Brawner's argument that delegation of the mitigation issue to a law clerk resulted in a complete denial of counsel. The court said that "complete denial of counsel . . . for a critical stage" would warrant relief, but found this situation was not present. *Id.* at 261. The federal district court more thoroughly addressed this argument. It concluded that Walker did not delegate the entire case to his law clerk. Because Walker had "filed motions, argued motions, directed and cross-examined witnesses, delivered opening and closing statements, and objected throughout trial." *Brawner*, 2010 WL 383734, at *11.

We agree the state court did not unreasonably apply clearly established federal law to the issue of a complete denial of counsel.

C.    *The Role of Waiver in Ineffective Assistance Claims*

Ineffective assistance of counsel claims have two components. "First, the defendant must show that counsel's performance . . . fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. This standard applies to capital sentencing procedures. *Id.* at 686-87.

As we discussed earlier, we consider the first factor, objective reasonableness, by looking to "prevailing professional norms" such as the ABA

Guidelines. *Id.* at 688. The second factor, prejudice, arises when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

A thorough investigation of mitigating evidence is necessary for effective representation of death-eligible defendants. *See id.* at 690-91; *Wiggins v. Smith*, 539 U.S. 510, 521-22, 524-25 (2003); *Williams v. Taylor*, 529 U.S. 362, 390, 395-99 (2000). "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. This duty was briefly discussed in the ABA Guidelines in effect at the time of Brawner's trial, which stated: "Counsel's duty to investigate is not negated by the expressed desires of a client." ABA Guidelines § 11.4.1 cmt.[1]

The Supreme Court has granted habeas relief when post-conviction investigations of mitigating evidence reveal substantially more evidence about the defendant's family and social history than trial counsel discovered, and the failure to introduce that evidence was prejudicial. *See Wiggins*, 539 U.S. at 525, 527-28. If defense counsel chose not to investigate, that decision "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691.

Notwithstanding this well-established duty, defendants may later excuse their attorney's inadequacies, if any, in investigating and presenting mitigating evidence. *See Amos v. Scott*, 61 F.3d 333, 348 (5th Cir. 1995). In *Amos*, the defendant alleged ineffective assistance for "his counsels' failure to investigate and prepare mitigating evidence about his background and mental health." *Id.* at 347. The state habeas court found the defendant had "strongly opposed

---

[1] The current ABA Guidelines "discuss the duty to investigate mitigating evidence in exhaustive detail." *Bobby v. Van Hook*, 130 S. Ct. 13, 17 (2009).

No. 10-70020

having any witnesses testify on his behalf during the punishment phase of his trial." *Id.* at 348. The district court held that there was no prejudice from a potential failure to investigate more thoroughly because the defendant "would not have permitted those witnesses to testify anyway, so what they might have said is academic." *Id.*

On appeal, Amos argued that despite his desire that members of his family not testify, he had not insisted that no witnesses should be called and no investigation and presentation of mitigating evidence occur. *Id.* at 348-49. This court disagreed, holding that Amos had made it clear that he wanted no one to testify on his behalf, and therefore the state court's finding to that effect should be accepted. *Id.* at 349. Even if interviews of some of the family would have revealed the abuse Amos had suffered as a child, that possibility did not matter because Amos did not want to present mitigation testimony. *Id.*[2]

Brawner makes a similar argument that although he did not want his mother to "beg" for his life, his lawyer misinformed him of other available options for mitigation, and Brawner never intended to waive the investigation or presentation of all mitigating evidence. Brawner did allow one witness to testify during mitigation, as compared to Amos's opposition to "having any witnesses testify on his behalf." *Id.* at 348.

---

[2] In one pre-*Strickland* case, a defendant argued ineffective assistance of counsel for his attorney's failure to investigate possible witnesses for the sentencing phase and the defendant's life history. *Autry v. McKaskle*, 727 F.2d 358, 360 (5th Cir. 1984). There was substantial evidence, though, that the defendant had displayed "strong resistance to a life sentence," turned down the state's offer of a life sentence, and turned down an offer of a 40-year sentence. *Id.* at 361. The district court concluded "that Petitioner's rejection of all plea bargain offers permits an inferentially drawn conclusion that Petitioner preferred the risk of a death sentence to the certainty of an extended term of imprisonment," and denied the ineffective assistance of counsel claim. *Id.* (emphasis omitted).

We affirmed. The defendant's decision was "a knowing one," supported by testimony, and therefore his attorney was "ethically bound to follow [his] wishes." *Id.* at 362-63 (citing the ABA Standards Relating to the Defense Function (1970)).

No. 10-70020

To obtain relief on a claim such as this, the petitioner must show both that the attorney was constitutionally ineffective and that the ineffectiveness prejudiced him at trial. *Id.* at 347. A court may deny relief "based solely on a petitioner's failure to meet either prong of the test." *Id.* at 348 (citation omitted). As we held in *Amos*, a defense attorney following his client's informed and voluntary decision that a mitigation case not be presented does not commit professional error because such conduct is following the client's informed wish, and is not prejudicial because the evidence would not have been introduced over the defendant's objection. *Id.*

The Mississippi Supreme Court denied Brawner's habeas claim in part by relying on one of our decisions in which the state court rejected a similar post-conviction ineffective assistance claim when the petitioner had not wanted any members of his family at the trial. *See Dowthitt v. Johnson*, 230 F.3d 733, 748 (5th Cir. 2000). We affirmed the denial of relief. *Id.* at 749. "Counsel will not be deemed ineffective for following their client's wishes, so long as the client made an informed decision." *Id.* (citing *Autry v. McKaskle*, 727 F.2d 358, 361 (5th Cir. 1984)); *see also Sonnier v. Quarterman*, 476 F.3d 349, 362 & nn.5-6 (5th Cir. 2007) (collecting cases).

Brawner argues that the Mississippi Supreme Court did not rule on either *Strickland* prong, thus permitting *de novo* review. We disagree. Although that court declined to rule whether counsel was ineffective, that was because Brawner could not establish prejudice after he knowingly directed his attorney not to present mitigating evidence. *Brawner II*, 947 So. 2d at 261; *cf. Porter v. McCollum*, 130 S. Ct. 447, 451 n.6 (2009). Regardless of the quality of investigation, there was no prejudice because any relevant evidence would not have been introduced.

We agree with the state court's reasoning with one caveat. A necessary component of our analysis is that Brawner's decision not to allow a mitigation

11

case to be presented was a voluntary and knowing one. We will address that issue next.

### D.    *Whether Brawner's Waiver Was Knowing and Voluntary*

The cases we have just discussed lack a consistent standard by which to evaluate the sufficiency of the defendant's statement about not wishing to proceed with a mitigation case. In *Amos*, the defendant explained his wishes in a colloquy with the trial judge and "acknowledged that he understood the consequences." *Amos*, 61 F.3d at 349. In *Autry*, we found that "nothing in this record reflects any change in the level of Autry's rationality or in the voluntary and knowing character of his decision, in the three years since trial. And no one, not even his present counsel, offers any evidence that Autry is, or was, incompetent." *Autry*, 727 F.2d at 362. In yet another case, the district court determined that the defendant was competent and "made a knowing and intelligent waiver"; the court of appeals wrote that the defendant "steadfastly," "intelligently," and "competently" waived his rights. *Lenhard v. Wolff*, 443 U.S. 1306, 1311-12 (1979) (citation omitted).

The Supreme Court has declined to establish a standard to evaluate a defendant's waiver of the presentation of mitigating evidence. *Schriro v. Landrigan*, 550 U.S. 465, 478-79 (2007). "We have never imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce evidence." *Id.* at 479 (citation omitted). In that case, the Court assumed without deciding that the proper rule was one of informed and knowing waiver. *Id.*

We need not establish a standard today either. We will review Brawner's statements to confirm that he was competent and that his wishes were consistent, knowing, and voluntary.

Brawner's principal argument is that his statements waiving the presentation of mitigating evidence were not made knowingly because his attorneys misinformed him about the role and nature of such evidence. He also

asserts that his statement at trial that he did not "deserve to live" is not the same as affirmatively wishing to be sentenced to death. We consider these arguments in our review of the record evidence.

Approximately three months after the murders, Brawner saw his former probation officer Kenneth Fox[3] at the jail and talked to him. Brawner later said: "I told him that I had done something wrong and I imagined that I would get the death penalty for it. I told him I didn't know very much about the drugs they used on you when they do lethal injections, but that I knew there was other people out there that needed organs." Fox told him to put it in writing.

Brawner gave Fox a handwritten letter two days later, which Fox turned over to the police. The letter read:

> You told me to write down what I'd asked you for earlier. Well, instead of wasting the taxpayers' money anymore, I am guilty of murder. I was not in my right mind then but that still doesn't excuse what I did. I'm sorry for it and wish everyday I could take it back but I can't. So, here we are. With the current situation I am suffering in this jail. I won't last much longer so to save us a lot of heartache, how about just go ahead and putting me to death, so to speak. I will explain. I will not live life in prison so I'm asking for the death penalty. I know this is a special request but instead of lethal injection that will mess up my organs, I want to go out of this world in the hospital while I am donating my heart. . . . Please honor my request. . . . I make this request of sound mind and body.

Approximately five months after the murders, on September 18, 2001, Brawner met with the law clerk, and rejected the suggestion that he plead guilty to avoid the death penalty. According to a memo the law clerk wrote that day, Brawner "said it was his desire to suffer the death penalty than to spend the rest of his life in prison. He would [choose] death over life. We discussed this in detail, and at the end of our discussions, [Brawner] did not change his mind." The next day, Walker wrote Brawner to confirm his wishes. On September 20,

---

[3] In 1998, Brawner was convicted of several counts of burglary and grand larceny.

2001, Brawner replied, "I did say I <u>do not</u> want to plead guilty in exchange for a life sentence. I will take what the Jury says [and] nothing less."

On November 15, 2001, Brawner wrote a letter to Walker in which he admitted to the murders and expressed frustration with Walker's representation. Brawner then wrote, "I am guilty of a crime [and] I need to be put to Death!" Walker responded four days later, stating, "I advised you that you make my job hard because you tell that you do not wish to spend your life in prison. Only the jury can sentence you to death. A judge cannot. You cannot." Walker concluded,

> I simply need for you to advise me in writing of your response to the following two questions: (1) Do you wish to contest your guilt of any or all of the four counts of capital murder at your trial? (2) Do you wish to contest the death penalty if you are found guilty of any or all of the four counts of capital murder? Your instructions on how you desire me to proceed on these two matters will be honored.

The record does not show a response from Brawner.

Some of the correspondence is inconclusive. For example, on December 19, 2001, Brawner wrote Walker and provided a list of five "persons who can testify on my behalf" and their contact information. It is not clear whether Brawner suggested that these people testify during the guilt phase – he had claimed the insanity defense – or during mitigation. The law clerk spoke with Brawner shortly thereafter, then suggested in a memo to Walker that the five persons could be used to "testify as to [Brawner's] mental state before committing the crimes"; the clerk did not suggest using them for mitigation. Brawner's current attorneys claim that his trial team only contacted one of these witnesses.

On March 15, 2002, the trial court held a hearing on Brawner's motion to suppress inculpatory statements. Brawner during direct examination said this:

> [Walker]: And you don't wish life without parole in this case if you get convicted, do you, Mr. Brawner?
> [Brawner]: No, sir.

No. 10-70020

[Walker]: You either want to be declared mentally insane or you want the death penalty? . . .
[Brawner]: That's correct.
[Walker]: Not 'life without parole' or 'life'?
[Brawner]: No, sir.
[Walker]: All right.

Psychologists at the Mississippi State Hospital at Whitfield also assessed Brawner's mental state before trial. On March 25, 2002, they reported the following: "During this evaluation, Mr. Brawner reported that he has had thoughts of killing himself while incarcerated. He also reported intermittently experiencing thoughts of killing two other inmates housed in the same facility. . . . He reported that he would harm himself or someone else if he felt that doing so would help ensure that he would either receive 'help' or the death penalty."

At trial, the State Hospital psychiatrist testified that based on the evaluation, Brawner "demonstrated clearly" his sanity and understanding of his legal situation, the charges, the penalties, the expectations, the role of witnesses, among other critical facts and processes.

After the prosecution rested, Brawner repeatedly and clearly stated his wishes during a colloquy in Chambers:

[Walker]: Mr. Brawner, do you wish for me to try to get you 'life' or 'life without parole,' if you are, in fact, found guilty of any of these counts by the jury? In other words, it's what the lawyers call 'put on a mitigation case,' call your mother as a witness to tell about your background, call Dr. Marsha Little-Hendren to tell what she found. How do you wish me to proceed, is what I need to know from you?
[Brawner]: As far as life, I don't feel that I deserve life to live.

This dialogue continued for several pages of the transcript. Brawner asked that his mother testify during the guilt phase, then withdrew that request after Walker's statement that "she really doesn't have anything to add, I don't think, at this stage whether you're guilty or not guilty." Brawner then stated he did not wish for her to testify at mitigation.

15

No. 10-70020

The trial judge stated,

> I think it's ultimately Mr. Brawner's decision in consultation with his two lawyers. . . . I think the State has at this point, at least, got sufficient evidence before the jury that Mr. Brawner is competent to assist counsel.  It's like I told you, Mr. Brawner, you've got to make this decision and direct your lawyers which way you want the case to go.

Walker added that in his previous ten capital murder trials, "I've never had a capital murder client tell me not to ask for life or life without, not to put on a mitigation case."  Walker turned to Brawner and said, "you know, you kind of put me in a quandary here, I'm being asked to do something that I haven't done in ten capital murder trials, but I will respect your opinion . . . ."

One of the prosecutors questioned Walker to make a record.  Walker stated that he recommended presenting mitigating evidence and had prepared a mitigation case, but was not going to pursue it per his client's wishes.

Walker then questioned Brawner again.  Brawner stated he knew and understood both phases of capital murder trials, understood the possible sentence, and confirmed that he did not want his mother to, as Walker put it, "beg for you to get life or life without parole."

The conference ended and Brawner's case-in-chief began.  Brawner testified, but his insanity defense collapsed quickly on cross-examination.  He admitted that he knew right from wrong, agreed that he had planned the murders, knew he had to "cover up" what he was about to do, shot four people, attempted to cover up the crimes, then lied to the police afterward.  After admitting to all four murders and the underlying felonies, Brawner said he would have murdered a fifth victim if he had to.

The prosecutor concluded by asking Brawner, "[w]hat do you deserve?"  Brawner replied, "[d]eath."  The jury returned a guilty verdict on all four counts.

Before sentencing, the trial judge held another colloquy in chambers. The judge said he would instruct the jury on mitigating factors. "[E]ven though counsel for the defendant tells me that he has been instructed not to seek any mitigation instructions, I'm doing that against defense counsel's wishes." The prosecutor clarified that defense counsel had actually advised the defendant to put on mitigation evidence, "but the defendant had elected to ask the Court not to give them against counsel's objections."

Finally, Brawner's attorney sought the court's permission "to get in one more time . . . that this is [Brawner's] last chance to tell me to present [his] mitigation case[]. He's never wavered from that." Brawner was then questioned by his attorney as follows:

> [Walker]: Mr. Brawner, when the jury gets back from lunch [the prosecutors] are going to ask the jury to impose the death penalty upon you. You have consistently throughout my representation of you, and Mr. Defer, instructed me not to present what's called a mitigation case. In lay terms that means ask for life or life without parole. Is that still your desire that I not ask for life or life without parole at the sentencing phase of this trial?
> [Brawner]: Yes, it is.

The prosecutor then asked if Brawner understood what had happened so far, the consequences of his decision, and that "this is a free and voluntary decision that you're making against your lawyer's advice?" Brawner again said: "It is." The judge concluded, "I think Mr. Brawner is in full control of his faculties. . . . I think he's made a free and voluntary choice, and he's consistently instructed his lawyer to take this position. . . . The Court finds that he is competent."

When the parties returned to court for the punishment phase, Brawner's attorney did in fact present a limited mitigation case. He called Brawner's former probation officer to testify about the living conditions on Mississippi's

death row.[4] Walker was apparently attempting to show that life without parole would be a harsher penalty than death. Walker's closing argument at sentencing confirmed this strategy, with this conclusion: "[I]f you're a vindictive person, if you're a vengeful person, you want to put the most hurt on Mr. Brawner that you can, then you decide in your mind is it a two-minute death via lethal injection or is it 50 years in Unit 32 at the Mississippi Department of Corrections?" The jury returned a sentence of death.

Brawner's wishes did not change after trial. On August 23, 2003, he wrote the Mississippi Supreme Court, copying the State Attorney General and his attorney, and asked that "after this one mandatory appeal I wish to forgo any and all further appeals." Brawner elaborated on his wishes in the version he sent to the Attorney General, which stated, "I do understand the situation I place myself in by waiving any further appeals. I will be put to death. I have had over a year and a half to think about all of this and my mind is made up."

One year later, during his state habeas proceedings, Brawner reiterated his request in an August 6, 2004 letter to the clerk of the Mississippi Supreme Court. "I request motions, petitions, Appeals, and/or stays of execution of any kind Filed by my counsel and/or persons trying to [represent] me be withdrawn and that a Mandate of affirmance be issued forth with." He then reiterated this request and described that he no longer wanted legal representation. On the same day, he wrote the trial court a similar letter asking for an execution date "set with out further delay" and "expedited review of this waiver."

The voluminous record supports that, aside from a relatively weak attempt to be declared legally insane, Brawner consistently sought the death penalty. The trial judge concluded that not only had Brawner's testimony not contradicted any of the elements of capital murder, he had in fact "[b]olstered"

---

[4] Fox was also the prosecution's witness during sentencing. He testified to aggravating factors warranting the death penalty.

the argument for guilt and the penalty of death. Brawner's wishes remained the same for over three years, throughout pre-trial, trial, direct appeal, and state habeas proceedings.

It is true that Walker's description of Brawner's mother's mitigation testimony as merely 'begging for life' was not an accurate characterization or sound counseling of his client. The depth of Walker and Defer's mitigation investigation has also been called into question by the substantial evidence accrued during the various habeas proceedings. There is no evidence that Brawner was uncooperative; he did not interrupt or object when his attorney called his one witness during mitigation. *E.g.*, *Schriro*, 550 U.S. at 476-77.

But it is also true that Brawner was not shown to be incompetent or that his decision to seek the death penalty was not a knowing, voluntary, and intelligent choice. The Mississippi Supreme Court had significant evidence that Brawner was not prejudiced by any ineffective assistance of counsel because he actively and repeatedly sought the death penalty.

As a final matter, we note that before reading the jury instructions, the trial judge told Walker, "I'm afraid of the scenario that [Brawner's] saying I've got mental problems, and then for you not to beg for a lesser punishment, the Supreme Court would say well, the lawyer should have overridden his client's feelings to that extent." The judge concluded, "I've never seen a lawyer put in a worse situation than you're in." The prosecutor agreed.

Considering the substantial record evidence, we cannot say that the Mississippi Supreme Court's resolution of Brawner's ineffective assistance claim was objectively unreasonable. Brawner has not made the "substantial showing" necessary for a COA to issue on this claim. 28 U.S.C. § 2253(c)(2).

II.    *Discrimination Against a Pregnant Juror*

Brawner's other argument for a COA is that the prosecutor committed constitutional error when she exercised a peremptory challenge against a

pregnant juror on the basis of the pregnancy. Brawner exhausted this claim by raising it during his direct appeal. *Brawner I*, 872 So. 2d at 7-12.

A defendant must establish unconstitutionally discriminatory jury selection by a three-part test:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Miller-El*, 537 U.S. at 328-29 (citing *Batson v. Kentucky*, 476 U.S. 79, 96-98 (1986)). *Batson* was later extended to make unconstitutional discrimination in jury selection based on sexual stereotypes. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 137 (1994). The Supreme Court found it essential to end the perpetuation of "prejudicial views of the relative abilities of men and women." *Id.* at 140. Even one instance of striking a pregnant juror as a convenient pretext for gender discrimination would be unconstitutional. *Id.* at 142 n.13.

*J.E.B.* did not purport to eliminate the use of peremptory challenge, though. "Parties still may remove jurors who they feel might be less acceptable than others on the panel; gender simply may not serve as a proxy for bias." *Id.* at 143. "Even strikes based on characteristics that are disproportionately associated with one gender could be appropriate, absent a showing of pretext." *Id.* The Supreme Court has never ruled on the characteristic of pregnancy, which is obviously associated exclusively with one sex.

During voir dire in Brawner's case, the prosecution struck three women and one man, tendering a proposed jury composed of seven women and five men. *Brawner I*, 872 So. 2d at 8. Brawner's counsel objected on the basis that three out of the four strikes were used against women, citing *J.E.B.* and *Batson*. *Id.* at 8-9. The trial court found that Brawner had failed to meet the threshold

showing of bias, "not with [the prosecution] having accepted seven [women] out of the first twelve," and then granted the prosecution's request to state her reasons for the strikes. Brawner's argument focuses on the striking of Juror Number 38, who was pregnant.

The prosecutor first stated that she struck the juror on the basis of the pregnancy. Brawner's attorney responded that "there's no proof that this lady's going to have a baby this week or next week or that she can't serve physically because she's pregnant." The prosecutor replied, "last week in the Tribble case, we had a pregnant juror and she had trouble – particularly difficulties with the lack of air conditioning in our courtroom." There was no further argument after that; the judge directed the parties to "move on."

The Mississippi Supreme Court fully rejected Brawner's argument that the prosecutor displayed bias based on gender. *Id.* at 7-12. It included in its opinion a table showing the relevant characteristics of all 36 members of the venire who were considered or struck before a full jury was seated. *Id.* at 7. The venire was slightly more than 60 percent female, and of the 12 jurors ultimately selected, 75 percent were female. *Id.* at 10.

The Mississippi Supreme Court accepted the trial judge's finding that Brawner had failed to establish a prima facie case of discrimination. *Id.* at 10. The trial judge was found to have properly allowed the prosecutor to state her reasons for the strikes on the record, but later arguments about the propriety of those reasons did "not lessen the burden on the defendant to establish the prima facie case." *Id.* at 10-11 (citation omitted). Therefore, the court concluded, it was "not necessary to review each gender neutral reason offered by the State for its strikes," including the reasons given for the pregnant juror. *Id.* at 12.

In direct appeals as in habeas proceedings, "[d]eference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in *Batson*, the finding largely will turn on

evaluation of credibility." *Miller-El*, 537 U.S. at 339 (citation and quotation marks omitted). Even where "[r]easonable minds reviewing the record might disagree about the prosecutor's credibility" – which we do not – "on habeas review that does not suffice to supersede the trial court's credibility determination." *Rice*, 546 U.S. at 341-42. Brawner has not made a substantial showing that he has any clear and convincing evidence that could satisfy AEDPA's standard of review. *See id.* at 338-39.

We disagree that the Mississippi Supreme Court permitted the trial judge to collapse the second and third steps of the *Batson* analysis. The trial judge ruled on Brawner's objection before the prosecutor issued her gender-neutral reason. *See Hernandez v. New York*, 500 U.S. 352, 359 (1991) (holding the first step of *Batson* was moot when the prosecution stated its reasoning before the trial judge ruled on the objection). This was not error.

In addition, even if we assume Brawner's attorney made out a prima facie case, the record shows no evidence that the prosecutor's reason for using a peremptory strike on the pregnant juror was a pretext for excluding women. The prosecutor identified the previous pregnant juror's "difficulties with the lack of air conditioning in our courtroom" in a trial just one week prior to Brawner's. Pregnancy necessarily will affect only female jurors, but the prosecutor's stated reason here was health-related and was grounded to a recent event. It was not evidence of unconstitutional discrimination.

The state court's resolution of this claim was not unreasonable. That conclusion is not debatable. A COA will not issue.

MOTION DENIED.